**PENN STREET, L.P.,** Appellant

v.

**EAST LAMPETER TOWNSHIP ZONING HEARING BOARD and East Lampeter Township.**

Commonwealth Court of Pennsylvania.

Argued Dec. 11, 2013.

Decided Jan. 29, 2014.

Robert W. Gundlach, Jr., Warrington, for appellant.

Jill M. Laskowitz, Lancaster, for appellee East Lampeter Township.

BEFORE: SIMPSON, Judge, and COVEY, Judge, and COLINS, Senior Judge.

OPINION BY Judge SIMPSON.

In this fact-intensive land use appeal, Penn Street, L.P. (Applicant) asks whether the Court of Common Pleas of Lancaster County[1] (trial court) erred in affirming a decision of the Zoning Hearing Board of East Lampeter Township (ZHB) that rejected Applicant's substantive validity challenges to the Revised Zoning Ordinance of East Lampeter Township–1990 (zoning ordinance) and the Township Zoning Map as well as its accompanying request for site-

---

1. The Honorable Margaret C. Miller presided.

specific relief. Applicant argues: the R–Rural zoning of its property constitutes unlawful reverse spot zoning; the lot restrictions in the R–Rural zoning district are substantively invalid; and, it was denied due process by the ZHB's failure to maintain a neutral role as the fact-finder and adjudicator. After review, we affirm.

## I. Factual and Procedural Background

Applicant owns a 16.11–acre tract of land located at the intersection of Bowman Road and Rockvale Road in East Lampeter Township (Township), Lancaster County (the property). The property is located in the R–Rural zoning district.[2] Applicant seeks to subdivide the property into 54 parcels and develop single family homes on each parcel.

In December 2011, Applicant filed an application with the ZHB raising substantive validity challenges to the zoning ordinance. In its application, Applicant asserted, in relevant part:

1. *Spot Zoning Challenge.* The Applicant is challenging the inclusion of the [p]roperty in the R–Rural [z]oning [d]istrict as shown on the Township Zoning Map. The basis for this challenge is that the R–Rural [z]oning designation constitutes 'reverse spot zoning' because the [p]roperty is being treated differently than other similar properties in the triangle that were zoned to the more permissive C–2 Commercial zoning designation, without any justification for the difference in treatment.

2. *Dimensional Challenge.* The Applicant is challenging the validity of Section 704(2) of the [z]oning [o]rdinance, which limits development of properties containing more than 10 acres, but less than 25 acres, to development of only one (1) additional lot from the existing lot. The specific reasons for this challenge are that Section 704(2), as applied to the [p]roperty, is:

(a) unreasonable, arbitrary, unduly restrictive, exclusionary, and not a valid exercise of the Township's police power;

(b) an unreasonable infringement upon an affected landowner's constitutionally protected right to freely use and enjoy the landowner's property;

(c) is not consistent with the 'Urban Growth Boundary' designation of the [p]roperty; and

(d) is contrary to the holding in [*Hopewell Township Board of Supervisors v. Golla,* 499 Pa. 246, 452 A.2d 1337 (1982) ], which invalidated a zoning ordinance that limited development of properties in the agricultural zone to a maximum of five (5) additional residential lots. By limiting development of the [p]roperty to only one (1) additional lot, the Township's lot restrictions are even more restrictive than those invalidated by the Pennsylvania Supreme Court in the *Hopewell* case.

East Lampeter Township, ZHB Application, Certified Record (C.R.), Item # 3 at 1, p. 4–5. Hearings ensued before the ZHB.

During the course of four ZHB hearings, Applicant presented the testimony of a land planner, a traffic engineer and a civil engineer. The Township presented the testimony of two land planners, one of whom is also a professional engineer.

Ultimately, the ZHB issued an extensive decision containing over 100 findings of fact in which it denied Applicant's substantive validity challenges. In its decision,

---

**2.** A copy of the Township Zoning Map, depicting the location of the property is found at Reproduced Record (R.R.) at 224a, and an enlarged depiction of the area in the vicinity of the property is found at R.R. at 313a.

the ZHB credited the testimony of the Township's witnesses over that presented by Applicant's witnesses. Essentially, the ZHB found the testimony of the Township's witnesses established the majority of lands in the vicinity of the property are both zoned R–Rural and used for agricultural purposes. The ZHB found that all the properties at the four quadrants of the intersection of Rockvale Road and Bowman Road are, like Applicant's property, zoned R–Rural. Additionally, all the properties south of the intersection of Rockvale Road and Bowman Road and extending all the way to the Strasburg Township line are zoned R–Rural as are, generally, all the properties to the west all the way to the West Lampeter Township line. The ZHB stated that, by nature and soil composition, the property is substantially similar to the lands to the south, southwest and west, all of which are zoned R–Rural and are predominantly used for agricultural purposes.

Further, the ZHB stated, Applicant's reverse spot zoning challenge focused solely on those properties to the north and east of Applicant's property, which are part of the Rockvale Outlets (shopping center) and, thus, zoned C–2 Commercial. Applicant referred to this area as the "triangle," which is the block bounded by Lincoln Highway, Hartman Bridge Road, Rockvale Road and Bowman Road, and which includes Applicant's property in the southwest corner of the triangle. *See* ZHB Op., 6/28/12, Finding of Fact (F.F.) No. 63; Concl. of Law No. 15. In so doing, the ZHB stated, Applicant focused solely on the remaining land within the triangle area, all of which was part of the Rockvale Outlet Center. Applicant essentially ignored the lands to the south, southwest and west.

Upon review of the larger area as a whole, the ZHB determined, the only C–2

Commercial properties are those that have frontage on U.S. Route 30/Lincoln Highway East, and Applicant's property does not have direct access to this major roadway. The ZHB also rejected Applicant' argument that the location of its property in the "Urban Growth Boundary," a designation found in county and regional comprehensive plans, provided a basis to invalidate the property's R–Rural zoning designation. Rather, the "Urban Growth Boundary" designation in the comprehensive plans was merely one of several-land planning devices, and Applicant's property was designated for rural or agricultural use in other land planning documents.

Ultimately, as to the reverse spot zoning issue the ZHB determined, "it is apparent that the [p]roperty could not remotely be considered an island or peninsula of rural zoned land surrounded by land zoned commercial or for any other development purpose." ZHB Op., Concl. of Law No. 19.

The ZHB also rejected Applicant's substantive validity challenge to the R–Rural zoning district's density requirements set forth in Section 704(2) of the zoning ordinance. The ZHB determined the requirements were intended to preserve farming and agriculture and to do so by means of a "fixed scale system" by which a certain number of lots or uses would be permitted based on the size of the tract. ZHB Op., Concl. of Law No. 4. The ZHB further explained the Township's witnesses established that similar approaches were and continue to be used within Lancaster County, and such approaches are generally considered effective agricultural zoning. Additionally, the ZHB determined Applicant ignored the history of subdivisions of the parent tract from which Applicant's property was created. The ZHB explained the history of the subdivision of the parent tract revealed that all the development rights were allocated to por-

tions of the original, parent tract, other than Applicant's property. Thus, the ZHB determined, the zoning ordinance restrictions, as they apply to the property, result from the conscious decisions of Applicant's predecessors in title. As such, the ZHB denied Applicant's substantive validity challenges.[3] Applicant appealed to the trial court.

Without taking additional evidence, the trial court affirmed. The trial court determined the ZHB properly rejected Applicant's reverse spot zoning challenge as well as Applicant's challenge to the zoning ordinance's density regulations. Additionally, the trial court rejected Applicant's assertions regarding certain claimed procedural defects that occurred during the ZHB hearings, including the alleged bias displayed by the ZHB's Chairman during the course of the hearings. Applicant now appeals to this Court.

## II. Issues

On appeal,[4] Applicant asserts: (1) the R–Rural zoning of its property constitutes unlawful reverse spot zoning; (2) the lot restrictions in Section 704(2) of the zoning ordinance are substantively invalid; and, (3) it was denied due process by the ZHB's failure to maintain a neutral role as the fact finder and adjudicator.[5]

## III. Discussion

### A. Reverse Spot Zoning

Applicant first argues that, because zoning is an exercise of municipal police power on the fundamental rights of property owners, it must not be unjustifiably applied to a particular property. Rather, the constitutional limitations on municipal zoning power require that it be designed to accomplish "an average reciprocity of advantage," such that all property owners in a designated area be placed under the same restrictions. Appellant's Br. at 17. Applicant contends the tribunals below erred in holding the property is not unlawfully reverse spot zoned.

Applicant maintains that, as a result of the Township's rezoning of surrounding properties to C–2 Commercial, its property unjustifiably exists as a peninsula of R–Rural zoned land amidst a sea of commercially zoned and commercially developed properties. Applicant asserts that it is without justification that the property is located in the Township's Urban Growth Boundary designated for development and yet it has been singled out with restrictions that preclude development. Appli-

3. Based on its rejection of Applicant's substantive validity challenges, the ZHB explained Applicant's request for a special exception for its proposed residential subdivision, which accompanied its request for site-specific relief, was moot. However, in the interests of completeness, the ZHB considered Applicant's entitlement to a special exception, and it determined Applicant would not be entitled to such relief because Applicant did not satisfy the zoning ordinance's objective special exception requirements.

4. Because the parties presented no additional evidence after the ZHB's decision, our review is limited to determining whether the ZHB committed an abuse of discretion or an error

of law. *Taliaferro v. Darby Twp. Zoning Hearing Bd.*, 873 A.2d 807 (Pa.Cmwlth.2005). The ZHB is the fact-finder here. *Id.*

5. Applicant also contends it is entitled to site-specific relief in the form of approval of its concept plan pursuant to Section 1006–A of the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, added by the Act of December 21, 1988, P.L. 1329, *as amended*, 53 P.S. § 11006–A. For the reasons set forth below, however, we conclude the ZHB and the trial court properly rejected Applicant's reverse spot zoning and substantive validity challenges. As a result, we need not reach Applicant's claim that it is entitled to site-specific relief.

cant focuses on what it calls the "block," asserting the property is located in the southwest corner of an 81–acre triangular block of properties bounded by Lincoln Highway—Route 30, Bowman Road, Rockvale Road and Hartman Bridge Road. *See* Appellant's Br. at 7. With the exception of the property, Applicant argues, all of the other properties in the block were rezoned and are now used for high-density purposes. Thus, Applicant maintains, the property now exists as a peninsula of open land in this heavily developed commercial and residential corridor.

In support of its reverse spot zoning claim, Applicant relies heavily on our Supreme Court's decision in *In re Realen Valley Forge Greenes Associates,* 576 Pa. 115, 838 A.2d 718 (2003), as well as this Court's decision in *C.L. Associates v. Board of Supervisors of Montgomery Township,* 51 Pa.Cmwlth. 627, 415 A.2d 134 (1980).

The Township responds that Applicant failed to demonstrate the existence of spot zoning with regard to the property, which is zoned R–Rural, and which is located in a predominantly agricultural area also in the R–Rural zoning district. The Township asserts that, although the property is bounded on two sides by the Rockvale Outlets, the remaining two sides are bounded by rural lands. The Township argues its expert demonstrated that 52% of the lands within 1,000 feet of the property are engaged in agricultural use. The Township further contends the property's location in the Urban Growth Boundary does not trump its zoning classification, as such boundary is just one of many land planning tools, and other plans for the area contemplate agricultural use of the property. The Township maintains that Applicant did not establish that the rural zoning of its property was arbitrary or unreasonable.

As to the standards employed in analyzing a substantive validity challenge, in *Realen,* our Supreme Court explained:

[A] zoning ordinance must be presumed constitutionally valid unless a challenging party shows that it is unreasonable, arbitrary, or not substantially related to the police power interest that the ordinance purports to serve[;] nevertheless, [a]mong other reasons, an ordinance will be found to be unreasonable and not substantially related to a police power purpose if it is shown to be unduly restrictive or exclusionary.... Similarly, an ordinance will be deemed to be arbitrary where it is shown that it results in disparate treatment of similar landowners without a reasonable basis for such disparate treatment.... Moreover, in reviewing an ordinance to determine its validity, courts must generally employ a substantive due process inquiry, involving a balancing of landowners' rights against the public interest sought to be protected by an exercise of the police power.

Moreover, [t]he substantive due process inquiry, involving a balancing of landowners' rights against the public interest sought to be protected by an exercise of the police power, must accord substantial deference to the preservation of rights of property owners, within constraints of the ancient maxim of our common law, *sic utere tuo ut alienum non laedas.* 9 Coke 59–So use your own property as not to injure your neighbors. A property owner is obliged to utilize his property in a manner that will not harm others in the use of their property, and zoning ordinances may validly protect the interests of neighboring property owners from harm.

Hence, the function of judicial review, when the validity of a zoning ordinance is challenged, is to engage in a meaning-

ful inquiry into the reasonableness of the restriction on land use in light of the deprivation of landowner's freedom thereby incurred.

576 Pa. at 131–32, 838 A.2d at 718, 728 (internal quotations and citations omitted).

█ Spot zoning is the "unreasonable or arbitrary classification of a small parcel of land, dissected or set apart from surrounding properties, with no reasonable basis for the differential zoning." *Atherton Dev. Co. v. Twp. of Ferguson,* 29 A.3d 1197, 1204 (Pa.Cmwlth.2011) (quoting *BPG Real Estate Investors–Straw Party II, L.P. v. Bd. of Supervisors of Newtown Twp. Delaware Cnty.,* 990 A.2d 140, 150 (Pa.Cmwlth.2010); *Christman v. Zoning Hearing Bd. of Twp. of Windsor,* 854 A.2d 629, 634–35 (Pa.Cmwlth.2004)). "When faced with a spot zoning challenge, a reviewing court must presume the zoning ordinance is valid and constitutional; the burden of proving otherwise is on the challenging party, who must show that the provisions are arbitrary and unreasonable, and have no relation to the public health, safety, morals, and general welfare." *Atherton,* 29 A.3d at 1204 (quoting *Christman,* 854 A.2d at 635).

█ "Spot zoning must be clearly established; if the validity of the rezoning ordinance is debatable, it must be permitted to stand." *Id.* The most determinative factor in an analysis of a spot zoning question is whether the parcel in question is being treated unjustifiably different from similar surrounding land, thus creating an "island" having no relevant differences from its neighbors. *Id.*

This Court explained spot zoning as follows:

The key point is that when a municipal governing body puts on blinders and confines its vision to just one isolated place or problem within the community, disregarding a community-wide perspective, that body is not engaged in lawful zoning, which necessarily requires that the picture of the whole community be kept in mind while dividing it into compatibly related zones by ordinance enactments. In other words, legislation as to a spot is the antithesis of zoning, which necessarily functions within a community wide framework. . . . [Z]oning, to be valid, must be in accordance with a rational and well considered approach to promoting safety, health and morals and a coordinated development of the whole municipality.

*Twp. of Plymouth v. Cnty. of Montgomery,* 109 Pa.Cmwlth. 200, 531 A.2d 49, 57 (1987).

█ "There is no precise formula for determining whether a classification of property constitutes spot zoning and cases should be decided on the facts guided by case law." *Sharp v. Zoning Hearing Bd. of Twp. of Radnor,* 157 Pa.Cmwlth. 50, 628 A.2d 1223, 1228 (1975).

█ Reverse spot zoning, the theory advanced by Applicant, occurs where an "island" develops as a result of a municipality's failure to rezone a portion of land to bring it into conformance with similar surrounding parcels that are indistinguishable. *Realen; Atherton; Briar Meadows Dev., Inc. v. S. Centre Twp. Bd. of Supervisors,* 2 A.3d 1303 (Pa.Cmwlth.2010); *LHT Assocs. v. Twp. of Hampton,* 809 A.2d 1072, 1075 (Pa.Cmwlth.2002); *Guentter v. Montgomery Cnty., Borough of Lansdale,* 21 Pa.Cmwlth. 287, 345 A.2d 306 (Pa.Cmwlth.1993) (*en banc*).

Here, in rejecting Applicant's reverse spot zoning claim, the ZHB made the following detailed findings (with emphasis added):

41. In support of its application, Applicant has put forth various arguments as to why the [z]oning [o]rdinance and the

Township's actions with regard to the [p]roperty are unreasonable, arbitrary, unduly restrictive, and not a valid exercise of the Township's police power, including a reverse spot zoning challenge . . .

\* \* \*

53. *All the properties at the four quadrants of the intersection of Rockvale Road and Bowman Road are zoned R–Rural.* [ZHB Hearing, Notes of Testimony (N.T.) at 121.]

54. *All properties south of the intersection of Rockvale Road and Bowman Road and extending all the way to the Strasburg Township line are zoned R–Rural.* (N.T. 121 and 122)

55. *Although there are some residential uses located along the south side of Rockvale Road, all the residential uses/lots were created in or prior to 1976. None were created subsequent to the adoption of the fixed scale zoning approach within the R–Rural district.* (N.T. 273)

56. *Generally, all the land west of the intersection of Rockvale Road and Bowman Road extending to the West Lampeter Township line is zoned R–Rural.* (N.T. 118; N.T.122)

57. *The lot located immediately to the west of the [p]roperty, owned by Mr. and Mrs. Wortel, is a 15.34 acre tract upon which is operated a bed and breakfast within a farmhouse. It is part of a sheep farm, maple syrup farm and solar farm.* (N.T. 140)

58. The lot adjacent to the bed and breakfast tract is operated as a landscaping business and nursery as part of an adjoining 22 acre farm. (N.T. 140)

59. *If the [p]roperty were rezoned from R–Rural to C–2 Commercial, the [p]roperty would be the only property at the intersection of Rockvale Road and Bow-*

*man Road not zoned R–Rural.* (N.T. 122)

60. *There is nothing involving the soil makeup, topography or grade of the [p]roperty which is substantially different than the lands to the south, southwest and west of the [p]roperty.* (N.T. 122)

61. *The [p]roperty is comprised of prime agricultural Class I and Class II soils.* (N.T. 334)

62. Mr. Glackin [ (Applicant's land planner, whose testimony the ZHB rejected,) ] acknowledged that the [p]roperty has been used for farming purposes and that is currently enrolled in the preferential tax assessment program commonly known as 'Clean and Green.' (N.T. 146)

63. *In evaluating whether the zoning of the [p]roperty constitutes spot zoning, [Applicant's land planner], focused his study on the triangle/block in which the [p]roperty is located. The balance of the block, however, is part of the Rockvale Center shopping center and is zoned Commercial C–2.* (N.T. 73, 113)

64. *[Applicant's land planner], in examining the area around the [p]roperty, did not travel on Rockvale Road west of the intersection of Bowman Road and Rockvale Road.* (N.T.108)

65. *In traveling in the vicinity of the [p]roperty, [Applicant's land planner] traveled to the west on Lincoln Highway, which is the corridor along which the most extensive commercial properties exist. He did not travel west along Rockvale Road, which is the area where the agricultural uses exist (south and west of the [p]roperty).* (N.T. 109)

66. *The Rockvale Center is part of a C–2 Commercial zoning strip which basically parallels the Lincoln Highway.* (N.T. 122 and 123)

67. *While the Rockvale Center has direct access to Lincoln Highway East, the [p]roperty does not have any direct access to Lincoln Highway East.* (N.T. 115)

68. Mr. Kime [ (the Township's land planner, whose testimony the ZHB credited,) ] testified zoning map changes were made in 1990. In general, a major change was to relocate zoning boundaries along lot lines where possible but keep the same general zoning districts. (N.T.262)

69. [The Township's land planner] testified that such zoning boundary changes were made to properties located within the C–2 Commercial district, including those along ... Lincoln Highway in the vicinity of the [p]roperty. (N.T. 263)

70. Currently, the southernmost C–2 zoning boundary lines along Lincoln Highway East coincide with existing property lines. (Exhibit A–5)

71. There are no other properties in the vicinity of the [p]roperty which are primarily commercial and which have primary access to Rockvale Road or Bowman Road. (N.T.160)

\* \* \*

74. [The Township's land planner] emphasized that the Lancaster County Planning Commission created a planning document entitled Lincoln Highway Gateway Enhancement Plan, dated June of 2011 (the 'Enhancement Plan'). The Enhancement Plan creates a primary and secondary study area involving the Lincoln Highway and noted that the [p]roperty is located within the secondary study area. (Exhibit T–9; N.T.280)

75. In the Growth Management section of the Enhancement Plan, the stated goal is to restrict commercial development to the primary study area and to continue the preservation of open space and agricultural land use within the secondary study area. *Because the [p]roperty is located within the secondary area of the Enhancement Plan, the recommendation of the Lancaster County Planning Commission and the Enhancement Plan is to keep the [p]roperty in agricultural use.* (N.T.280)

76. Applicant argued that future sidewalks may be planned along the perimeter of the [p]roperty. However, the Enhancement Plan states that there is justification for extending some bikeways or walkways along Rockvale Road to Bowman Road and Bowman Road up to Lincoln Highway, simply recognizing that there are some residences along Rockvale Road. (N.T. 335–336).

\* \* \*

79. [The Township's land planner] testified that the [p]roperty relates better to the properties at the other corners of the intersection of Bowman Road and Rockvale Road than it does to the lands to the north and east located within the same block. It is the only land within that block that has no access to either Route 896 or the Lincoln. Highway East. (N.T.278)

80. *Mr. Skrincosky [ (the Township's expert land planner and engineer, whose testimony the ZHB credited,) ] further testified that the [p]roperty is consistent in nature and use with the land to the south and west and therefore should remain rural or agricultural.* (N.T.349)

\* \* \*

82. *There are no significant differences involving topography, soils or general suitability for agricultural purposes between the [p]roperty and the other areas depicted by [the Township's land planner] on Township Exhibit 8 (such [e]xhibit identifies other lands in*

*the vicinity of the [p]roperty which are zoned R–Rural).* (N.T.278)

\* \* \*

112. From the intersection of Rockvale Road and Bowman Road, the current uses of all the properties in the vicinity of the [p]roperty are as follows:

A. Standing at the intersection looking to the northeast (which is the subject site), it is an agricultural field.

B. To the southeast there are a few single homes along the south side of Rockvale Road with large agricultural areas immediately to the south of those homes.

C. To the southwest there is agricultural land and uses.

D. To the northwest there is generally agricultural uses, including the bed and breakfast and nursery, both of which are agricultural-related uses. (N.T.274)

113. *[The Township's land planner] prepared Township Exhibit 7 which depicts the actual uses of neighboring lands within 1,000 feet of the [p]roperty (the [p]roperty is approximately 1,000 feet from Lincoln Highway). The exhibit shows the calculation of actual uses of all lands within 1,000 feet the [p]roperty. Agricultural uses represent 52% of such area, residential uses 11%, and commercial uses 32%.* (N.T.275)

114. From Township Exhibit 7, it is immediately apparent that the commercial area referred to by Applicant is the Rockvale Center which is adjacent to the Lincoln Highway. (N.T. 275)

\* \* \*

116. *[The Township's land planner] further testified that the [p]roperty is not a predominantly residential area. Instead, it is predominantly agricultural.* (N.T. 284 and 285)

117. *In determining the area to be non-residential, [the Township's land planner] made the following observations. The individual dwellings on the south side of Rockvale Road in the vicinity of the site represent an existing linear strip of residential uses with the predominant use, however, being agricultural. Similarly, the property to the west, although having a bed and breakfast, is predominantly agricultural.* [The Township's land planner] noted that the reference by Applicant's witnesses to the Dorothea Park residential area, because it has no access directly to Bowman Road, is approximately 1,500 feet away from the site as measured by either a pedestrian or vehicle trip to the site. Similarly, the closest dwelling within the Willow Acres area referenced by ... Applicant's witnesses is 2,000 feet away measured by the distance traveled by either a pedestrian or vehicle. (N.T.284)

\* \* \*

[Conclusions of Law]

15. Applicant has focused almost exclusively on what in its application was referred to as the 'triangle' and in its presentation on the block bounded by the Lincoln Highway, Hartman Bridge Road, Rockvale Road and Bowman Road. By doing so ... Applicant focused only on the remaining land within that area, all of which is part of the Rockvale Center. *Applicant essentially ignored the surrounding lands to the south, southwest and west.*

16. *As was demonstrated by both the Township's witnesses and the Wortels* [ (who own adjoining property to the west of Applicant's property) ], *the majority of the lands in the vicinity of the [p]roperty are both zoned R–Rural and used for agricultural purposes. It is apparent that the essential nature of the*

area immediately in the vicinity of the [p]roperty is agricultural. Agricultural-lands extend all the way south from that intersection to the Strasburg Township line and all the way west to the West Lampeter Township line. It is visually apparent, especially when viewing Township Exhibit 7 ... and the Wortel Exhibit 1 which depicts a similar circular area surrounding the center point of the [p]roperty, that *most of the land surrounding the [p]roperty [is] both zoned R–Rural and used for agricultural purposes.* The C–2 Commercial district itself is a linear district located primarily on both sides of the Lincoln Highway, all of which has direct access to Lincoln Highway and is established as the commercial hub.

17. *The [p]roperty is the only site within the area bounded by Bowman Road, Rockvale Road, Hartman Bridge Road and Lincoln Highway East which does not have direct access to either Lincoln Highway East or Hartman Bridge Road.*

18. *By nature and soil makeup ... the [p]roperty is substantially similar to the lands to the south, southwest and west, all of which are zoned R–Rural and predominantly used for agricultural purposes.*

19. *Consequently, it is apparent that the [p]roperty could not remotely be considered an island or peninsula of rural zoned land surrounded by land zoned commercial or for any other development purpose.*

20. *While ... Applicant maintains that it was somehow impliedly misled by the delineation of the Urban Growth*

Boundary into assuming that the [p]roperty would be rezoned, the public record, including the deed to ... Applicant, established that the limitations on future development were both apparent and explicit.

\* \* \*

22. ... The [z]oning [o]rdinance is not invalid simply because the [local governing body] might have made a different or, in the opinion of ... Applicant, a better choice in location of a zoning district boundary. While the Supervisors might have made a different or, in the opinion of ... Applicant a better choice, the choice was theirs to make and the remedy for any such alleged error is not with the courts, but rather the ballot box.

23. The [z]oning [o]rdinance (and [z]oning [m]ap cannot be declared invalid merely because it may deprive ...) Applicant of the most lucrative and profitable use.

F.F. Nos. 41, 53–71, 74–76, 79–80, 82, 112–114, 116–117, Concls. of Law Nos. 15–20, 22, 23. Upon review, no error is apparent in the ZHB's rejection of Applicant's reverse spot zoning claim.

■ More specifically, Applicant's property is not completely surrounded (or surrounded on three sides) by properties with less restrictive zoning classifications. To that end, a review of the Township's zoning map reveals that, although the properties to the north and east of the property are zoned C–2 Commercial, the properties to the south and west of the property are zoned R–Rural, like Applicant's property. Reproduced Record (R.R.) at 224a.[6] Also, our review of Township Exhibit 7 relied on

---

**6.** Although some homes exist south of the property, the ZHB's supported finding indicates these uses were created in 1976 or earlier, before the adoption of the fixed scale zoning provision in the R–Rural district. ZHB Op., 6/28/12, Finding of Fact (F.F.) No. 55. Further, despite having a bed and breakfast located in a farmhouse, the property to the west is predominantly agricultural. F.F. No. 57.

by the ZHB, reveals that, of the properties within 1,000 feet of Applicant's property, 52% are used for agricultural purposes, while commercial uses account for 32%, and residential uses comprise 11%. C.R., Exhibits Pertaining to the Testimony of Sidney R. Kime, Jr., RLA, FASLA (Kime Exs.) at Ex. 7.

Further, the R–Rural zoning classification of the property, as compared to the C–2 Commercial zoning classification of the properties to the north and east, is not unjustified. To the contrary, the fact-finder here reasonably explained why Applicant's property was treated differently than some of the surrounding areas. In particular, the properties zoned C–2 Commercial, which are located to the north and east of the property, have frontage on the area's primary commercial artery, Lincoln Highway, while Applicant's property does not. Additionally, the properties that lie at the four quadrants of the intersection of Bowman Road and Rockvale Road, including Applicant's property, are all zoned R–Rural. The ZHB also explained there was nothing involving the soil makeup, topography or grade of the property that was substantially different from the lands to the south, southwest and west, and the property contains prime agricultural soils, which also justify its R–Rural zoning classification.

In *Atherton*, this Court rejected a claim of reverse spot zoning in a case that presented somewhat similar facts to those presented here. Specifically, the property at issue there, which was zoned for high density residential use, was not entirely surrounded by commercially zoned properties; rather, it was bounded on one side by residential use and partially, on another side, by residential use. More importantly, there was no indication that the property's residential zoning classification, as compared to the commercial zoning of the

properties surrounding it on three sides, was unjustified. To the contrary, the fact-finder reasonably explained why the property at issue was treated differently than some of the surrounding the areas. The explanation included the fact that it did not front on the area's primary commercial corridor; rather, it had frontage on a smaller roadway like the other residentially zoned property to the south and southwest that adjoined the property. The fact-finder also determined the property at issue was more compatible with the adjoining residential-land than the adjoining commercial land, and it offered record based reasons for its determination.

Also, in *Atherton*, we explained that where "an honest difference of opinion" existed as to how a property should be zoned, and "sound policy" could support a decision that a property was properly zoned for either of two competing zoning classifications, we could not disturb a local governing body's legislative decision. To that end, "[i]t is well established that, if the validity of the legislation is fairly debatable, the legislative judgment must be allowed to control." *Id.* at 1207 (citing *Guentter*, 345 A.2d at 310).

Further, while Applicant here repeatedly characterizes its property as a "peninsula" in a sea of less restrictive uses, in *Atherton*, this Court observed that "up to this point there has been no successful claim of reverse spot zoning in a 'peninsula' [ (as opposed to an 'island') ] fact situation." *Id.* at 1209.

Moreover, as in *Atherton*, the facts found by the ZHB here are sufficient to distinguish this case from *Realen*, the primary case relied on by Applicant. In *Realen*, our Supreme Court considered "the validity of the agricultural zoning of a tract located in the heart of one of the most highly developed areas in the region, entirely surrounded by an urban land-

scape, and immediately adjacent to what is currently the world's largest shopping complex at one discrete location: the Court and the Plaza at King of Prussia." *Id.* at 119, 838 A.2d at 720. The 135–acre property at issue in *Realen,* which was zoned agricultural, was used as a golf course and was located at the confluence of the region's primary arterial highways and immediately adjacent to one of the most intensely developed commercial areas in the region. Although surrounding tracts were originally zoned for agricultural use, between 1955 and 1985, the vast majority of the properties in the agricultural district were rezoned to permit intense commercial development, with the exception of the golf course tract. The equitable owner of the golf course tract, who sought to develop it for a large multi-use development, challenged the validity of the agricultural zoning of the tract. The zoning board, court of common pleas and this Court rejected the challenge.

On further appeal, however, a majority of the Supreme Court sustained the developer's reverse spot zoning challenge. In so doing, the Supreme Court employed a substantive due process analysis, balancing the landowner's rights against the public interest sought to be protected by an exercise of the police power. The Court explained that in reviewing a spot zoning challenge, the critical inquiry is whether the rezoned land was treated unjustifiably different from similar surrounding land. The Supreme Court stated, "[t]he question is whether the lands at issue are a single, integrated unit and whether any difference in their zoning from that of adjoining properties can be justified with reference to the characteristics of the tract and its environs." *Id.* at 135, 838 A.2d at 730. The Court concluded no difference in the zoning could be justified. Specifically, the Court, speaking through former Justice Lamb, stated:

We hold that th[e] agricultural zoning [of the property at issue], designed to prevent development of the [property at issue] and to 'freeze' its substantially undeveloped state for over four decades in order to serve the public interest as 'green space', constitutes unlawful 're-verse spot zoning' beyond the municipality's proper powers . . . .

Of the land characteristics offered by the zoning board in support of its rejection of the spot zoning challenge, only the size of the tract and its location entirely bounded by arterial highways, are the subject of any discussion. There can be no question, as the zoning board found, that arterial roadways are, in many instances, an appropriate feature to be designated as the boundary between incompatible zoning districts. But the issue here is not whether *any* zoning district designation could be appropriately applied to the [g]olf [c]lub's lands but whether the [agricultural zoning] [d]istrict designation can be so justified. It turns reason and land planning precepts on their head to assert, as the zoning board's decision implies, that this tract's *restricted, agricultural zoning* is justified by its ready access to the region's primary arterial roads on every hand. Apart from a bare assertion that it is so, neither the zoning board nor the courts below have offered either reason or authority to support the proposition, essential to the propriety of the decision here reviewed, that the location of [the] highways [that entirely bound the golf course property] makes agricultural zoning appropriate for this tract while the properties on the opposite side of the same roadways are appropriately zoned and developed for intense, commercial use. Any relationship between agricultural zoning and the other tract characteristics identified in the decisions be-

low, including the property's topography and shape, is similarly unexplored in the evidence of record, the findings of the [b]oard, or the arguments of appellees....

On this record, no characteristic of the [g]olf [c]lub's property justifies the degree of its developmental restriction by zoning as compared to the district designation and use of all of the surrounding lands both within the [t]ownship and in the adjoining municipality. This is spot zoning.

We recognize that the circumstances here presented differ factually from the spot zoning cases we have previously decided in the chronology of the municipal action creating the unjustified 'island' of disparate zoning. In previous cases, the island was created by a single municipal act directed toward the property which became the disputed island; either to that property owner's benefit or detriment. Here, in contrast, the [g]olf [c]lub's status as an island of agricultural zoning was the product of a series of rezonings of surrounding properties beginning in the 1950's and ending in about 1985.

[The developer] contends that the origin of a tract's unjustified zoning treatment as compared to adjoining properties is not decisive and we agree. It is the difference in treatment that must be justified, not its origin or chronology. Some courts have used the term 'reverse spot zoning' to describe the circumstances where the unjustified difference in treatment arises from the rezoning of lands surrounding the tract at issue and this term appropriately underscores the distinction between cases like that here presented where an island is created by the rezoning of other land from the more common situation where the challenged legislation is that creating the island tract.

*Id.* at 119, 135–36, 838 A.2d at 720, 730–31 (emphasis in original). As a result, the Supreme Court sustained the developer's validity challenge.[7]

For the reasons set forth above, the case presently before this Court is distinguishable from *Realen*. Specifically, Applicant's property is not completely surrounded (or surrounded on three sides) by properties with less restrictive zoning classifications. In fact, the properties to the south and west of the property are zoned R–Rural, like Applicant's property. More importantly, the R–Rural zoning classification of the property as compared to the C–2 Commercial zoning classification of the properties to the north and east is not unjustified. Indeed, the fact-finder here reasonably explained why Applicant's property was treated differently than some of the surrounding areas, including the fact that, unlike Applicant's property, the adjacent, commercially zoned properties to the north and east have frontage along the area's primary commercial corridor, and Applicant's property fronts on a smaller roadway that it shares with adjoining R–Rural zoned properties.

Also, as in *Atherton*, we reject Applicant's reliance on *C.L. Associates* as that case is distinguishable. There, a landowner whose property was split-zoned residential and commercial sought to have the smaller residential portion of his property rezoned for commercial use. In response to the landowner's request for rezoning, the local governing body rezoned the entire property for residential use. The landowner challenged the validity of the

---

**7.** In a thoughtful dissenting opinion, Justice Saylor opined that the zoning board's supported findings warranted rejection of the reverse spot zoning challenge.

rezoning, and this Court agreed with the common pleas court that:

> [The local governing body's] act of amending the zoning map by drawing an indentation in the line separating the [commercial] and [residential] zoning districts tailored to the [landowner's] property lines and inserting therein the [landowner's] property as a peninsula of residentially zoned land in a sea of commercial zoning (and uses) was classic spot zoning that is, it was the creation of 'an island' (or peninsula) of more or less restricted uses within a district zoned for a different use or uses and also singling out ... a small area for different treatment from that accorded to similar surrounding land ... to the economic detriment of the owner. An examination of the township's zoning map after the amendment reveals no interruption in the perfectly straight lines marking the [commercial] zoning along [the township's main highway] save that drawn around the [landowner's] property, although those lines pass through many other properties, large and small.

*Id.* at 136 (citations and quotations omitted).

Here, unlike in *C.L. Associates*, the property is not an R–Rural use in a "sea" of commercial or residential zoned properties or uses. Although the properties to the north and east of the property are zoned and used for commercial purposes, the properties to the south and west are zoned rural and are generally used for agricultural purposes. Further, unlike the affirmative act of rezoning in *C.L. Associates*, there is no indication here that the local governing body singled out Applicant's property for differential treatment from similar surrounding uses as the properties at the intersection of Rockvale Road and Bowman Road, which include Applicant's property, are all zoned R–Rural.

Applicant also relies heavily on the fact that the property lies in the Urban Growth Boundary as an indicator that commercial or residential use is contemplated for the property. However, the ZHB made several findings in which it rejected Applicant's argument premised on the property's inclusion within the Urban Growth Boundary, stating (with emphasis added):

43. *With regard to Urban Growth Boundary, the Township has adopted the Conestoga Valley Region Strategic Comprehensive Plan of 2003 (the 'Comprehensive Plan').* (N.T. 72)

44. *The [p]roperty is located within the Urban Growth Boundary as shown on the Comprehensive Plan.* (N.T. 75–76)

45. *The 'Urban Growth Boundary' is part of the Comprehensive Plan and is defined in the Comprehensive Plan as providing a boundary that separates areas appropriate for urban growth from areas intended for agricultural, rural or natural resource uses.* (N.T. 75)

46. The [p]roperty is likely the largest property in the Township which is located within the Urban Growth Boundary and is also zoned R–Rural. (N.T.37)

47. [Applicant's land planner] focused on the inconsistency between the R–Rural zoning line and the Urban Growth Boundary and essentially concluded that one of the two must be incorrect because they are inconsistent. (N.T. 126)

48. *The future land use map within the Comprehensive Plan, however, depicts the [p]roperty as being within the future rural/agricultural area, even though it retains its location within the Urban Growth Boundary.* (N.T. 44)

49. [The Township's land planner] testified that the inclusion of the [p]roperty within the Urban Growth Boundary is not itself a compelling reason which mandates that the [p]roperty be rezoned. (N.T. 286)

50. *The use of Urban Growth Boundaries is simply another tool with which local government can plan for future land uses.* (N.T. 287)

51. *The use of an Urban Growth Boundary can be helpful in channeling development and in preserving farmland, but is not essential.* (N.T. 330, 331)

52. [The Township's land planner] acknowledged that municipalities could make use of additional tools and additional zoning ordinance features in order to preserve agriculture, such as: (i) limitation of particular uses depending on soil types; (ii) the use of transferrable development rights; (iii) limitation within rural or agricultural districts of certain large land consumption uses; and (iv) the use of a purpose clause within a rural district. All such features and tools could be helpful in preserving farmland and agricultural uses, but are not essential. (N.T. 326 through 328)

\* \* \*

[Conclusions of Law]

9. ... Applicant asserts that the [z]oning [o]rdinance is inconsistent with the [p]roperty's designation within the Urban Growth Boundary in the Comprehensive Plan.

10. *Applicant omits any acknowledgment of Section 303(c) of the MPC [,] [53 P.S. § 10303(c) ].*

11. Section 303(c) of the MPC, Legal Status of Comprehensive Plan Within the Jurisdiction that Adopted the Plan, states as follows:

(c) Notwithstanding any other provision of this act, no action by the governing body of a municipality shall be invalid nor shall the same be subject to challenge or appeal on the basis that such action is inconsistent with,

or fails to comply with the provisions of the comprehensive plan.

12. The [Township] Board of Supervisors adopted the Comprehensive Plan in accordance with the authorization of Article III of the MPC.

13. *Based upon Section 303(c) of the MPC, no action of the Board of Supervisors can be invalid or subject to challenge on the basis that such action is inconsistent with, or fails to comply with the provisions of the Comprehensive Plan.*

14. Notwithstanding Section 303(c) of the MPC, and even if ... Applicant is correct in its assertion that the Urban Growth Boundary designation is inconsistent with the Comprehensive Plan (which the Board does not agree or conclude), the use of Urban Growth Boundary tool and designation is simply one of many planning tools.

F.F. Nos. 43–52, Concls. of Law Nos. 9–14. We discern no factual or legal error in the ZHB's determinations.

Factually, the Township's land planner, whose testimony the ZHB credited, described the purpose of the Urban Growth Boundary, which is set forth in the Conestoga Valley Region Strategic Comprehensive Plan of 2003, as a planning device. He testified that the Urban Growth Boundary can be a helpful tool, but it is not mandatory that a municipality permit development of land in the Urban Growth Boundary. R.R. at 199a–200a. He also acknowledged there are many land planning documents or tools that can be used, but no one plan or tool "trumps" the others. R.R. at 159a. To that end, the "Future Land Use" map within the Conestoga Valley Region Strategic Comprehensive Plan contemplates agricultural use of the property despite the Urban Growth Boundary designation. R.R. at 229a. Additionally, the "Lincoln Highway Gateway

Enhancement Plan," a plan created by the Lancaster County Planning Commission, contemplates agricultural use of the property. Kime Ex. 9. Further, the Township's other land planning witness opined the goal of farmland preservation is better served by retaining the existing zoning boundary and maintaining a rural zoning designation for Applicant's property rather than expanding the commercial zoning district boundary to coincide with the Urban Growth Boundary. C.R., N.T., 5/24/12, at 348–49.

Legally, in *Atherton,* this Court rejected an argument that a zoning ordinance's inconsistency with a comprehensive plan could provide a basis upon which to sustain an applicant's reverse spot zoning challenge, explaining:

> [The applicant] asserts, in contravention of the MPC, the [fact-finder's] decision is inconsistent with the comprehensive plan, and the [fact-finder] did not provide a justification for this inconsistency. . . .

> We recently rejected the same argument in *Briar Meadows,* a case which also involved a substantive validity challenge based on a claim of reverse spot zoning. Specifically, this Court explained:

>> In *CACO Three, Inc. v. Board of Supervisors of Huntington Township,* 845 A.2d 991 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 580 Pa. 707, 860 A.2d 491 (2004), this court addressed the status of a comprehensive plan in reviewing a lower court's disapproval of a preliminary land development plan. This court stated that while a comprehensive plan is a useful tool for guiding growth and development, it is by its nature, an abstract recommendation as to land utilization. Inconsistency with a comprehensive plan is not a

proper basis for denying a land development plan. *Similarly, it cannot be a basis for a substantive challenge to a zoning ordinance. Here, [the developer] filed its challenge on the basis that the [o]rdinance, which zones some of the property [a]gricultural, is inconsistent with and fails to comply with the comprehensive plan. As acknowledged by [the developer], however, 53 P.S. § 10303(c) does not authorize such a challenge.*

*Id.* at 1307 (emphasis added); *see also Blue Ridge Realty [& Dev. Corp. v. L. Paxton Twp.,* 51 Pa.Cmwlth. 349, 414 A.2d 737 (1980)] (comprehensive plan does not have the legal effect of a zoning ordinance, the former is merely recommendatory while the latter is regulatory).

In a very brief footnote, [the applicant] asks this Court to recede from the holding above on the ground that our decision in *CACO Three* only held that inconsistency with a comprehensive plan cannot be the *sole* basis for denying a land development plan, and *CACO Three* did not indicate a comprehensive plan is not a factor to be considered. In *CACO Three,* this Court stated:

> Although a comprehensive plan is a useful tool for properly guiding growth and development of the community, it is only intermediate and inconclusive steps in the land use planning. Unlike a specific and regulatory zoning ordinance, a comprehensive plan is, by its nature, an abstract recommendation as to desirable approaches to land utilization and development of the community.

> Consequently, any inconsistenc[y] with the comprehensive plan, standing alone, cannot justify disapproving the land development plan.

*Id.* at 995 (citations omitted).

Based on the language used in *CACO Three*, which we reiterated virtually verbatim in *Briar Meadows*, we discern no reason to 'recede' from our holding in *Briar Meadows*. Further, regardless of [the applicant's] assertions, Section 303(c) of the MPC, 53 P.S. § 10303(c), makes it clear that a party cannot successfully maintain a validity challenge based on an alleged inconsistency with a comprehensive plan. Additionally, while [the applicant] asserts a comprehensive plan is a factor to be considered in the context of a validity challenge, as explained more fully above, [the applicant's] validity challenge fails on the merits. Thus, as [the applicant] acknowledges, its showing of an inconsistency with the comprehensive plan is, without more, insufficient to prevail on a validity challenge.

*Atherton*, 29 A.3d at 1213–14.

For all these reasons, the property's location in the Urban Growth Boundary as set forth in the Conestoga Valley Region Strategic Comprehensive Plan of 2003 does not support Applicant's reverse spot zoning claim.

Further, Applicant points out that the Lincoln Highway Gateway Enhancement Plan contemplates "future sidewalks" around the property, indicating that some development was contemplated for the property. R.R. at 309a. As explained above, however, the Lincoln Highway Gateway Enhancement Plan, which is merely a planning document, contemplates agricultural use of Applicant's property. F.F. Nos. 74–75; Kime Ex. 9. Moreover, the Township's land planner explained that there was justification for extending bikeways or walkways along Rockvale Road to Bowman Road and Bowman Road up to Lincoln Highway in recognition of the fact that there are some residences along Rockvale Road. F.F. No. 76. In any

event, a notation regarding proposed, future sidewalks around the property, set forth in a planning document, does not mandate a conclusion that Applicant's property was intended for some higher intensity developed use.

Applicant also points out that its property is distinguishable from the agricultural properties in the R–Rural district because the property is not part of the Township's Agricultural Security Area (ASA). Again, we disagree. Applicant's bald assertion in this regard makes no mention of the fact that the process for inclusion of property in an ASA is distinct from the zoning/land use process. Specifically, the process for inclusion of property in an ASA must be initiated by the landowner, and any application for inclusion involves a consideration of several statutory factors by the local governing body, following a public hearing, and any such application may be opposed. *See, e.g., 41 Valley Assocs. v. Bd. of Supervisors of London Grove Twp.*, 882 A.2d 5 (Pa.Cmwlth.2005). Thus, the fact that Applicant's property is not included in the ASA could be based on any number of considerations, and, as a result, the fact that Applicant's property does not lie in the Township's ASA does not clearly distinguish from it other rurally zoned properties, which are in fact included in the ASA.

## B. Substantive Validity Challenge to Density Restrictions

Applicant next asserts the tribunals below erred in upholding the validity of Section 704(2) of the zoning ordinance, which limits development to only one lot per 25 acres on any tract containing more than 10 acres. Applicant argues these lot restrictions are excessive and unreasonably restrict a landowner's right to freely use and enjoy his property. Even if the Township's lot restrictions were intended

to further agricultural preservation, Applicant maintains, that does not outweigh the Township's obligation to provide for reasonable growth in the area of the Township designated for development. Applicant contends that in *Main Street Development Group, Inc. v. Tinicum Township Board of Supervisors,* 19 A.3d 21, 27 (Pa.Cmwlth.2011) (*en banc*), this Court held that municipalities must balance their right to preserve agricultural soils with their obligations to provide for reasonable growth. Here, Applicant asserts, the Township has simply gone too far with their zoning restrictions on a property in the growth district.

Additionally, Applicant maintains, Section 704(2)'s lot restrictions suffer from the same defect identified in *Hopewell Township Board of Supervisors v. Golla,* 499 Pa. 246, 452 A.2d 1337 (1982), because they are discriminatory in application. While the Township may have a legitimate interest in protecting agriculture, that does not justify the disparity of treatment in allowing owners of properties less than 10 acres to subdivide off an unlimited number of lots while owners of properties between 10 and 25 acres are limited to developing only one additional-lot.

Applicant also argues that in *C & M Developers, Inc. v. Bedminster Township Zoning Hearing Board,* 573 Pa. 2, 820 A.2d 143 (2002), the Supreme Court held that lot restrictions in an agricultural district that resulted in a density yield of one lot per three acres were not reasonable or substantially related to the township's interests in preserving its agricultural lands or activities. As in this case, Applicant asserts, the zoning ordinance there restricted a landowner's ability to subdivide his property based on the size of the tract as of the time the ordinance was adopted. Based on a straightforward application of *C & M Developers,* Applicant maintains,

the lot restrictions in Section 704 of the zoning ordinance, which create an unreasonably low density yield, do not pass constitutional muster.

Further, Applicant contends, the zoning of the property as R–Rural is invalid because it is inconsistent with the property's designation as part of the Urban Growth Boundary, an area allocated for the purpose of higher density development. Applicant asserts that, as this Court held in *Hock v. Board of Supervisors of Mount Pleasant Township,* 154 Pa.Cmwlth. 101, 622 A.2d 431 (1993), a significant factor in determining the reasonableness of a land use restriction is whether it is consistent with the stated purpose of the property's zoning designation. Here, Applicant argues, the inconsistency between the R–Rural lot restrictions as applied to a property in the Urban Growth Boundary is a significant factor warranting invalidation of the zoning ordinance and Township Zoning Map.

Applicant also asserts that certain aspects of the zoning ordinance's R–Rural District regulations belie the ZHB's determination that the purpose of the R–Rural District is agricultural preservation. Specifically, Applicant points to the lack of a stated purpose for the R–Rural District, the fact that the R–Rural District permits a number of non-agricultural uses by special exception, and the fact that the applicable impervious coverage limitation is high for an agricultural district. Applicant argues its witnesses established the provisions of the R–Rural District are more geared toward excluding residential development than promoting agricultural activities, including the lack of reference to agricultural preservation based on the classification of agricultural soils.

The Township counters that the ZHB properly held that the "fixed scale" zoning structure in Section 704 of the zoning ordi-

nance is valid. Such a structure is used by a majority of townships in Lancaster County to promote agricultural preservation, one of the goals of the zoning ordinance here. The Township asserts the area ranges in Section 704 are in line with those utilized by other local townships. The Township further contends that Applicant is unable to subdivide its property because of decisions made by its predecessors in title, which are apparent on the subdivision plan and expressly reflected in the deed to the property. Thus, regardless of Section 704, the Township maintains, Applicant could not subdivide its property as it wishes.

When presented with a challenge to a zoning ordinance, a reviewing court presumes the ordinance is valid. *Main Street.* The burden of proof is on the party challenging the ordinance, and where its validity is debatable, it must be upheld. *Boundary Drive Assocs. v. Shrewsbury Twp. Bd. of Supervisors,* 507 Pa. 481, 491 A.2d 86 (1985). A zoning ordinance is a valid exercise of a municipality's police power when it promotes public health, safety or welfare, and its regulations are substantially related to the purpose the ordinance purports to serve. *Main Street.* To determine if these factors are met, Pennsylvania courts use a substantive due process analysis balancing the public interest served by the zoning ordinance against the confiscatory or exclusionary impact of the regulation on individual rights. *Main Street.* In other words, we must examine the reasonableness of the restriction on land use in light of the deprivation of the landowner's freedom thereby incurred. *Id.* The party challenging the constitutionality of a zoning provision must establish it is arbitrary, unreasonable and unrelated to public health, safety, morals and general welfare.

*C & M Developers; Boundary Drive; Hopewell Twp.*

Further, in *Main Street,* this Court explained:

The MPC ... sets forth various requirements for the zoning ordinance. With regard to agriculture, Section 603(g)(1) provides that 'zoning ordinances shall protect prime agricultural land,' and Section 603(h) states, '[z]oning ordinances shall encourage the continuity, development and viability of agricultural operations' and may generally not restrict them where agriculture traditionally has been present. In addition, Section 604(3) provides, 'The provisions of zoning ordinances shall be designed to preserve prime agriculture and farmland considering topography, soil type and classification, and present use.' This section shows that the municipality must consider soil type at the time it determines which areas should be zoned for agricultural uses.

Even though the MPC mandates that the zoning ordinance protect agriculture and prime agricultural lands, it also requires that the zoning ordinance facilitate reasonable development. Sections 604(1), (4) and (5) provide that the zoning ordinance shall be designed 'to promote, protect and facilitate ... coordinated and practical community development,' '[t]o provide for the use of land within the municipality for residential housing [including] ['single-family and two-family dwellings, and a reasonable range of multifamily dwellings in various arrangements'] and '[t]o accommodate reasonable overall growth, including population and employment growth and opportunities for development of a variety of residential dwelling types and nonresidential uses.' Thus,

the MPC requires a balancing between agriculture and development.

*Id.* at 27.

 In addition, "[z]oning for density has been recognized as the legitimate exercise of the police power to preserve the farmlands. A ny minimum acreage requirement is not unconstitutional per se; rather, its constitutionality must be determined on a case-by-case basis under a different set of facts and circumstances." *McGonigle v. L. Heidelberg Twp. Zoning Hearing Bd.*, 858 A.2d 663, 669 (Pa. Cmwlth.2004) (citing *Nat'l Land & Inv. Co. v. Easttown Twp. Bd. of Adjustment,* 419 Pa. 504, 215 A.2d 597 (1965)).

Section 704 of the zoning ordinance, which is set forth in the R–Rural District regulations, states, in its entirety (with emphasis added):

SECTION 704. *NUMBER OF LOTS AND USES PERMITTED*

1. *For every twenty-five (25) acres of an existing lot or contiguous lots or part thereof under single ownership as of January 23, 1987, there may be only one (1) use permitted in addition to the uses existing as of January 23, 1987 on the existing lot, or one (1) new lot subdivided from the existing lot* provided the new lot and the remaining portion of the existing lot are in conformance with all lot, yard, area, dimensional and height requirements of the Rural District, subject to Paragraph 5 of this Section. (Amended 10/5/92 by Ord. # 150)

2. On an existing lot or contiguous lots under single ownership that had a lot area of ten (10) acres or more, but was less than twenty-five (25) acres in lot area as of January 23, 1987, there may be only one (1) use permitted in addition to the existing uses on the existing lot, or one (1) new lot subdivided from the existing lot provided the new lot and the remaining portion of the existing lot are in conformance with all lot, yard, area, dimensional and height requirements of the Rural District, subject to Paragraph 5 of this Section. (Added 10/5/92 by Ord. # 150)

3. A single family detached dwelling may be erected on any single lot of record as of January 23, 1987, notwithstanding the limitations imposed by Paragraphs 1 and 2 of this Section. Such lot must be in single ownership and not of continuous frontage with other lots of the same ownership. This provision shall apply even though such lot fails to meet the minimum requirements of area or width, or both, that are applicable to this District, provided that height, dimensional and yard requirements for the lot other than those applying to the area or width shall conform to the regulations of this District. (Amended 10/5/92 by Ord. # 150)

4. *On a lot of record or contiguous lots of record under common ownership as of January 23, 1987, that had a lot area of less than ten (10) acres as of January 23, 1987, there may be an unlimited number of permitted uses developed in addition to the existing uses on the existing lot, or an unlimited number of lots subdivided from the existing lot or lots provided that the following lot area requirements are met:* (Amended 10/5/92 by Ord. # 150)

(A) The minimum lot area per dwelling unit or other principal building where not served by public sanitary sewer facilities shall be forty thousand (40,000) square feet.

(B) The minimum lot area per dwelling unit or other principal building where currently served by both public sanitary sewer and public water facilities, or by public sanitary sewer facilities only, shall be twenty-two thousand five hundred (22,500) square feet. This provi-

sion shall not apply to those lots where it would be necessary to extend public sewer and public water facilities to such lots.

(C) All other dimensional requirements shall be met.

5. Where the permitted uses or lots are developed totally on non-tillable land, there shall be permitted two (2) uses or lots in addition to those permitted by Paragraphs 1 and 2 of this Section, provided the following conditions are met: (Amended 10/5/92 by Ord. # 150)

(A) The uses and lots meet all other requirements of this Ordinance.

(B) The application for development shall show the extent of the area of non-tillable land. Where the application indicates the extent of the area of the non-tillable land as being different from that designated by the Soil Conservation Service, the applicant shall be required to submit a field survey of the area in question. The field survey shall be sealed by a professional qualified to perform such a survey and shall have adequate detail to justify the area being designated as non-tillable land.

(C) The design for lots or uses shall be prepared so as to preserve, to the greatest extent possible, land suitable for agricultural uses.

(D) The burden of proof for demonstrating that certain land is non-tillable shall be on the applicant.

*Id.* Thus, in addition to any uses in existence when the restrictions went into effect, generally one new use is allowed for every 25 acres held. Section 704(1) of the zoning ordinance. The exception involves lots less than 10 acres (where new uses are restricted by the minimum lot area provisions of either 40,000 square feet or 22,500 square feet, depending on availability of public sewer and water). Section 704(4) of the zoning ordinance.

Here, in rejecting Applicant's substantive validity challenge to Section 704(2) of the zoning ordinance, the ZHB made the following pertinent determinations (with underlined emphasis added):

83. In evaluating whether the requirements of Section 704 of the [z]oning [o]rdinance (the fixed scale subdivision program in the R–Rural District) are reasonable, Applicant's witness focused almost exclusively on the fact that the [p]roperty is over 10 acres and properties of under 10 acres would have had a different number of uses available. (N.T.72)

84. The [z]oning [o]rdinance provides for a fixed scale provision based on the size of the parent tract as of January 23, 1987. (N.T.257)

85. *Although [Applicant's land planner] had highlighted in his testimony what he characterized as illogical differences in the treatment of properties larger than 10 acres and those smaller than 10 acres, he indicated he was not familiar with other ordinances focused on agricultural preservation which made use of a minimum lot size cutoff in connection with agricultural zoning.* (N.T. 110)

86. *[Applicant's land planner] did not study other Lancaster County ordinances or alternative approaches to agricultural-related zoning.* (N.T. 109)

87. *Similar fixed scale zoning approaches with lot sizes based on 20, 25 or 30 acres, are used for agricultural preservation within a majority of Lancaster County townships.* (N.T. 258)

88. *The [z]oning [o]rdinance contains some but not all of the features encouraged by the agricultural zoning district guidelines created by the Lancaster*

*County Planning Commission.* (N.T. 259)

89. *[Applicant's land planner] acknowledged that a number of the uses permitted by right or by special exception within the R–Rural District were those likely designed to preserve agriculture or are typically associated with agriculture.* He further acknowledged that a number of the dimensional requirements were different where applied to agricultural or farm uses. (N.T. 131, 132)

90. *Within the R–Rural [D]istrict, Section 708 requires a conservation plan from the County Conservation District or Penn State Extension and Section 709 of the [z]oning [o]rdinance sets forth an agricultural nuisance disclaimer which is designed to protect and encourage agricultural uses.* (N.T. 256)

91. Although Applicant argued that the [z]oning [o]rdinance was defective because it used the term 'rural' district rather than 'agricultural' district, [the Township's expert land planner and engineer] testified that there is no significance in describing the zoning district as 'rural' as opposed to 'agricultural.' (N.T. 349)

92. Applicant argued that the [z]oning [o]rdinance is defective because it does not contain a specific purpose clause within the R–Rural District. [Applicant's witnesses] gave [their] opinion[s] that the [z]oning [o]rdinance was not designed to best preserve agricultural soils, focusing on the disturbance of agricultural soils and the lack of a stated purpose clause within the R–Rural [D]istrict. (N.T. 213 through 217)

93. *[Applicant's land planner], although emphasizing that the R–Rural district lacked a purpose clause which he construed as casting doubt on the purpose of the [z]oning [o]rdi-*

*nance being to preserve agricultural uses, acknowledged that the [z]oning [o]rdinance as a whole expressed as a purpose the preservation of prime agricultural and farmland and acknowledged that the R–Rural District was probably the district intended to fulfill that purpose.* (N.T. 130)

94. [The Township's expert land planner and engineer] testified that, although a statement of intent or goals within each zoning district is desirable, it is not necessary. (N.T. 351, 352).

95. Similarly, in [the Township's land planner's] judgment, there was no significance in the fact that the [z]oning [o]rdinance did not have a separate purpose clause within the R–Rural [D]istrict provisions of the [z]oning [o]rdinance as well as within the other general purpose districts within the township. (N.T. 261)

96. *[The Township's land planner] pointed out that Article II (the general purpose) of the [z]oning [o]rdinance explicitly includes the preservation of prime agricultural land and farmland.* (N.T. 261)

97. Applicant argued that the [z]oning [o]rdinance was defective because it does not contain a definition of 'prime agricultural soils'. However, [the Township's land planner] testified that such a definition is not necessary because all of the soils in [the] Township are overwhelmingly prime Class I, II and III soils. (N.T. 326–327)

98. Applicant argued that the [z]oning [o]rdinance was defective because it designated a 'rural' rather than 'agricultural' district. *[The Township's land planner] stated his opinion that there was no significance in the Township's use of the word 'rural' for its agricultural-related zoning district as opposed to 'agricultural.' He explained that the*

*Township had considered the issue but decided to retain the name 'rural' for historical reasons.* (N.T.260)

99. Applicant argued that the [z]oning [o]rdinance was defective because it does not utilize a transferable development rights program ('TDR program'). [The Township's land planner] testified, however, that few municipalities have adopted a TDR program, that most of the municipalities are struggling with such a program, and a TDR program is not essential in order to preserve agricultural land.

\* \* \*

[Conclusions of Law]

2. Applicant is challenging the validity of Section 704(2) of the [z]oning [o]rdinance. Applicant alleges that the reasons for this challenge are that: Section 704(2), as applied to the [p]roperty, is: unreasonable, arbitrary, unduly restrictive, exclusionary, and not a valid exercise of the Township's police power; an unreasonable infringement upon an affected landowner's constitutionally protected right to freely use and enjoy the landowner's property; and is contrary to the holding in [*Hopewell Township*].

\* \* \*

4. Applicant's witnesses focused on the difference in treatment of tracts which equal or exceed 10 acres and those which are less than 10 acres. *By contrast, the Township's witnesses established that the purpose of the distinction was to preserve farming and agriculture and to do so by means of a fixed scale system by which a certain number of lots or uses would be permitted, depending upon the size of the tract.*

5. The case relied upon by Applicant is easily distinguishable from the instant situation and the ... [z]oning [o]rdinance[.] In [*Hopewell Township*], [the] [t]ownship's zoning ordinance limited residential subdivisions in the prime agricultural zone to a maximum of five 1½ acre plots regardless of the size of the original parent tract. The Pennsylvania Supreme Court held that, by limiting residential subdivisions in the prime agricultural zone to a maximum of five 1½ acre plots *regardless* of the size of the original tract, an unreasonably severe limitation is place[d] upon permissible land uses.... The Pennsylvania Supreme Court stressed that the problem with the Hopewell Township Zoning Ordinance was that it restricted subdivision without regard to the size of the tract regulated. *In the instant matter, the [z]oning [o]rdinance takes into account the size of the parent tract and allocates subdivisions/uses based upon the size of the parent tract.*

6. The Township's witnesses established that similar approaches were and continue to be used within Lancaster County and that such approaches are generally considered to be effective agricultural zoning. While ... Applicant spent a great deal of time on the name of the zoning district, the lack of a purpose clause within the zoning district regulations, the lack of a definition or focus on prime agricultural soils and the inclusion of the subject tract within the separate Urban Growth Boundaries, *there was simply no credible evidence submitted which meets the strict requirements of demonstrating that the [z]oning [o]rdinance is unreasonable, arbitrary or not substantially related to the police power interest intended to be served. By contrast, the Township's witnesses established that the [z]oning [o]rdinance was modeled after and consistent with other effective agricultural zoning district approaches, both suggested by planners and adopted by other municipalities within Lancaster Coun-*

*ty,* that the use of the term 'rural' rather than 'agricultural' is simply irrelevant, that the purpose of the district was both apparent by the other provisions contained within the district and by the overall purpose expressed in the [z]oning [o]rdinance as a whole and that it simply made no sense to require an analysis of the soils of particular sites because of the fact that prime agricultural soils comprise substantially all the Township soils and substantially all of the R–Rural [D]istrict soils.

7. There is nothing in the law which suggests that a land use ordinance must contain every conceivable tool designed to produce a particular outcome or goal for it to be legitimately focused on achieving that outcome or goal. Beyond that, Applicant's witnesses who claimed that the Township's [z]oning [o]rdinance is invalid all acknowledged little to no professional focus on agricultural zoning and on the approaches to agricultural zoning within Lancaster County. By contrast, the Township's two witnesses both have a background in land use planning focused on agricultural zoning and have a substantial background with other Lancaster County approaches to agricultural zoning.

\* \* \*

9. The [z]oning [o]rdinance is not arbitrary or unreasonable simply because different regulations might have been enacted or there might be a different or even better way to accomplish the goal of agricultural preservation. The [z]oning [o]rdinance is not invalid simply because the [local governing body] might have made a different or, in the opinion of ... Applicant, a better choice in location of a zoning district boundary. Again, while the [the local governing body] might have made a different or, in the opinion of the Applicant a better

choice, the choice was theirs to make and the remedy for any such alleged error is not with the courts, but rather the ballot box.

10. The [z]oning [o]rdinance cannot be declared invalid merely because it may deprive ... Applicant of the most lucrative and profitable use.

11. Applicant has failed to satisfy its burden to demonstrate invalidity of the [z]oning [o]rdinance.

F.F. Nos. 83–99, Concls. of Law Nos. 2, 4–7, 9–11. For several reasons set forth below, we discern no error in the ZHB's rejection of Applicant's substantive validity challenge to Section 704(2) of the zoning ordinance.

■ First, although the zoning ordinance does not specifically contain a purpose section for the R–Rural zoning district, Article II(1), which sets forth the zoning ordinance's purpose, states that the zoning ordinance "is enacted for the following purposes: ... (C) *To preserve prime agriculture and farmland considering topography, soil type and classification, and present use.*" *Id.* (Emphasis added.) Also, a review of the zoning ordinance reveals there are no purpose clauses for each of the general use zoning districts in the Township such as the R–Rural District, the R–1, R–2 and R–3 Residential Districts, the C–1 and C–2 Commercial Districts and the Industrial District. Rather, only the special use districts, such as the Mixed Use Development District, the Conservation District, the Airport Hazard District and the Floodplain District, contain specific purpose clauses. Additionally, as the ZHB found, the purpose of the R–Rural District is apparent from a review of the zoning ordinance provisions governing that district (*see, e.g.,* Sections 708 (required conservation plan), 709 (agricultural nuisance disclaimer) and 710 (required nutrient management plans)). F.F.

No. 90; N.T. at 256–57. Further, the Township's land planner explained the intent of the R–Rural District was clarified by the inclusion of definitions of the terms "farm" and "tillable (and non-tillable) land" in the zoning ordinance. N.T. at 256; Article V of the zoning ordinance; *see* Tr. Ct., Slip Op. at 7.

Moreover, as set forth above, the ZHB determined the Township's witnesses established: (1) the purpose of the zoning ordinance's difference in treatment of tracts that are equal to or greater than 10 acres and those which are less than 10 acres was to preserve farming and agriculture and to do so by means of a fixed scale system by which a certain number of lots or uses are permitted depending on the size of the tract; (2) the zoning ordinance was modeled after and consistent with other effective agricultural zoning approaches, both suggested by planners and adopted by other municipalities in Lancaster County; (3) the name of the zoning district ("rural" as opposed to "agricultural") was irrelevant, and the Township considered the issue, but decided to retain the term "rural" for historical reasons; and, (4) it was unnecessary to require an analysis of the soils of particular sites because prime agricultural soils comprise substantially all of the R–Rural District soils.

In support of its argument that Section 704 of the zoning ordinance is arbitrary and discriminatory, Applicant emphasizes the fact that, based on that provision, lots of less than 10 acres may be developed with a greater number of uses or subdivided into a greater number of lots than lots with 10 acres or more. Contrary to Applicant's assertions, however, this does not render Section 704 of the zoning ordinance invalid.

By restricting development or subdivision of lots greater than 10 acres to a higher degree than lots less than 10 acres,

the Township is acting consistently with its intent to preserve prime agriculture and farmland through its "fixed scale system," while allowing for development of smaller tracts (those under the minimum farm size acreage), thereby balancing the required competing interests of preserving agriculture while facilitating reasonable development. *See* Article V of the zoning ordinance (defining a "farm" as *"[a] lot or plot of ten (10) acres or more* devoted to or available for the cultivation of land as described under agriculture.") (emphasis added); Kime Ex. 2 at p. 2 (October 2010 Lancaster County Planning Commission Guidelines, stating that, "Given that the majority of township zoning ordinances in Lancaster County have adopted a fixed scale system of allowing one lot or dwelling unit per 25 acres zoned, *and defined a minimum farm size of 10 acres,* agricultural zoning ordinances should be strengthened to more closely match the average acreage of the resource being protected.") (emphasis added); *cf. Boundary Drive Assocs.* (upholding validity of a zoning ordinance's "sliding scale" agricultural zoning provisions where ordinance provided that owner of a stated number of acres on the effective date of ordinance could build a stated number of dwellings on that tract, with the allowable number of dwellings *not* increasing in straight-line proportion to the size of the tract; although ordinance permitted a greater density of residential use on smaller tracts, the disparity rested on reasonable grounds, *i.e.,* promoting the goal of farmland preservation).

Further, the cases relied on by Applicant in support of its substantive validity challenge are distinguishable. First, in *Hopewell Township,* the Supreme Court invalidated a zoning ordinance that limited residential subdivisions in the township's prime agricultural zone "to a maximum of

five 1 1/2 acre plots *regardless* of the size of the original tract." *Id.* at 258, 452 A.2d at 1343 (emphasis in original). The Court held this provision constituted an unreasonably severe limitation on permissible land uses. Specifically, as applied to the landowners' 140–acre tract there, the ordinance would permit creation of a 7 1/2 acre residential development with a residual agricultural lot comprising 132 1/2 acres. "The need to preserve an agricultural tract as large as 132 1/2 acres, and the detriment to agriculture to be incurred by allowance of further subdivisions, are not so clearly established as to necessitate the zoning restrictions imposed." *Id.*

In addition, the Court in *Hopewell Township* held the ordinance suffered from another infirmity in that it had an arbitrary and discriminatory impact on different landowners. Specifically, the Court explained:

> The tract size in existence on the effective date of the ordinance was selected as a tract size to be preserved and which would be permitted to absorb subdivision to the extent of developing a 'minor residential land development' comprising 'five or fewer … dwelling units' without regard to the size of the tract so regulated. Such an arbitrary designation of tract size is argued to be consistent with the goal of maintaining tracts as large as possible with the auxiliary benefit being a likelihood that the tracts will continue to be used for agricultural purposes. However, an ordinance which does not bear alike on all persons living within the territory zoned, without a reasonable basis for the disparity of treatment, is discriminatory in application and cannot be justified under the police power. Under the scheme of the Hopewell Township ordinance, the owner of a small tract of land may devote a greater percentage of his total acreage to single-family dwellings than the owner of a large tract. Landowners of smaller tracts, therefore, bear a lesser burden of regulation in that a lesser percentage of their tracts are irretrievably devoted to agricultural uses than the percentage of tracts so devoted of landowners of large tracts. The public interest in preservation of farmland is insufficient to justify such a great disparity of treatment between large and small landowners; thus, the disparate burdens lack a reasonable basis. This discriminatory effect results from the mere circumstance of tract size on the effective date of the ordinance and from the limit of five residential lots which may be established without regard to the overall size of the tract. Were the ordinance to permit the dedication of one 1 1/2 acre lot to a single-family residence per each × number of acres in the tract, this scheme would have a more equitable effect and would avoid impacting landowners on an arbitrary basis. Hence, because of the discriminatory effect between different landowners, we conclude that the ordinance, by limiting development to an arbitrary number of dwelling units without regard to the size of the original tract, is invalid.

*Id.* at 258–59, 452 A.2d at 1343–44 (citation omitted).

Here, unlike in *Hopewell Township*, the zoning ordinance does not place a limitation on the number of uses on a particular tract *regardless* of tract size. Rather, the zoning ordinance here specifically takes into account the size of the original tract and allocates additional uses or subdivisions based on the size of the tract. *See Boundary Drive Assocs.* (distinguishing *Hopewell Township* where zoning ordinance at issue, which utilized a "sliding scale" approach, did, in fact, relate residential development to tract size).

Next in *C & M Developers,* the Supreme Court considered a zoning ordinance that required landowners in the township's agricultural preservation district (which covered approximately 90% of the township) with lots greater than 10 acres to set aside for agricultural uses 60% of their land that qualified as prime farmland and 50% of their land that qualified as farmland of statewide or local importance. In addition to these set-aside requirements, the zoning ordinance required that, of the remaining land, the landowner could only develop single-family homes on lots containing at least one acre, excluding watercourses, floodplains, floodplain soils, wetlands, lakes or ponds.

The Supreme Court held the 50% and 60% set-aside requirements were validly related to the township's interests in preserving its agricultural lands, and, when viewed alone, struck a reasonable balance between the township's interests in preserving agricultural lands and the landowner's desire to use his property as he wished. However, the Court determined that the set-aside restrictions, when coupled with the one-acre minimum lot size requirement, unduly limited a landowner's ability to sell, subdivide or develop the remaining portion of his tract, and lacked a substantial relationship to the township's interest in preserving its agricultural lands and activities. The Court explained that a review of the record regarding the local governing body's decision to choose the one-acre minimum lot size requirement revealed that the motivation for that requirement was that one-acre was "a 'good number' that would forestall the development of large houses on small lots." *Id.* at 26, 820 A.2d at 158. The Court held such justification exuded an exclusionary purpose. Thus, the Court invalidated the zoning ordinance.

Here, unlike in *C & M Developers,* the ZHB determined the zoning ordinance's fixed scale system, through which a certain number of lots or uses is permitted depending on the size of the tract, was used in the majority of municipalities in Lancaster County for purposes of agricultural and farmland preservation, which is clearly a legitimate goal, and is consistent with the agricultural district guidelines created by the County Planning Commission. *See* Kime Ex. 2; R.R. at 134a–36a. These uniform regulations do not unreasonably upset the balance between the Township's goals of preserving agricultural lands and a landowner's desire to use his property as he wishes. Moreover, unlike the motivation behind the one-acre minimum lot size provision in *C & M Developers,* there is no indication here that the intent behind the fixed scale system was arbitrary or exclusionary. To the contrary, the ZHB found that the motivation was agricultural preservation.

*Main Street,* also relied on by Applicant, is distinguishable. There, the zoning ordinance zoned 89% of the township rural agricultural or rural conservation. In addition, the zoning ordinance contained a township-wide soil overlay district, which restricted development to 25% of prime agricultural soils, additional farmland of statewide importance, and locally important soils on every lot in every zoning district. The effect of the overlay was to prohibit anything but agricultural uses within most of the remaining 11% of the township, which was devoted to multi-family residential and commercial uses. Based on the application of the soil overlay district, only 3% to 5% of the township remained available for non-agricultural uses. In holding the ordinance invalid, this Court explained, "a zoning ordinance that requires between 95% and 97% of the land in the [t]ownship to be used for agricultural purposes simply does not balance the

need for development and agricultural uses." *Id.* at 28. We held that, because the effect of the overlay district caused the entire township to become a *de facto* agricultural zone, it unduly disturbed the expectations created by the existing zoning ordinance, disturbed the balance between preserving agriculture and allowing development as mandated by the MPC, and unreasonably restricted the developer's use of its land. Thus, we held the overlay district was unconstitutional as applied.

Here, unlike in *Main Street,* there is no indication that the effect of the Township's zoning ordinance is so unduly restrictive as to create a *de facto* agricultural zone throughout essentially the entire Township, thereby precluding reasonable development. Further, as explained above, the property's location in the Urban Growth Boundary as set forth in the comprehensive plan does not trump its zoning classification in the R–Rural District. The Urban Growth Boundary is not an overlay district like the soil overlay district at issue in *Main Street,* and, as set forth above, other planning documents place the property in an area designated for agricultural use. Also, as explained above, "no action by the governing body of a municipality shall be invalid nor shall the same be subject to challenge or appeal on the basis that such action is inconsistent with, or fails to comply with, the provision of a comprehensive plan." *See* 53 P.S. § 10303(c).

Also inapplicable is *Hock,* cited in passing by Applicant for the proposition that a significant factor in determining the reasonableness of land use restrictions is whether the restrictions are consistent with the stated purpose of the property's

zoning designation. In *Hock,* we determined a zoning ordinance's three-acre minimum lot size requirement in the township's open space district could not be justified by the township's asserted interests in preserving farmland and the practice of agriculture where that alleged justification was not supported by the stated purpose of the open space district in the ordinance, which made no mention of agriculture or farming as an interest the township sought to foster in that district. The township's asserted justification was belied by the fact that the agricultural residential district, which was intended to protect the township's prime farmland, contained a less restrictive, two-acre minimum lot size requirement.[8]

Here, unlike in *Hock,* the ZHB's supported findings reveal that the fixed scale zoning system in the Township's R–Rural District is consistent with the zoning ordinance's stated purpose of "preserv[ing] prime agriculture and farmland considering topography, soil type and classification, and present use." Article II(1)(C) of the zoning ordinance. Also, as set forth above, our review of the R–Rural District regulations reveal that the district's purpose is agricultural preservation.

Of further note, the ZHB made several determinations regarding the actions taken to restrict development of Applicant's property by Applicant's predecessor-in-interest. These findings state (with emphasis added):

> 27. [Applicant's] [p]roperty was originally part of a larger parent tract, known as the Morgan property, which

---

8. In *Hock v. Board of Supervisors of Mount Pleasant Township,* 154 Pa.Cmwlth. 101, 622 A.2d 431 (1993), we also rejected the township's averred interests in pollution control and sewage disposal as justifications for the minimum acreage requirement. Further, we rejected the township's arguments that soil and topographic conditions, and "maintaining the rural character of the township" justified the minimum acreage requirement in the open space district. *Id.* at 435.

originally consisted of approximately 67 acres. (N.T. 264).

28. The entire Morgan property was located within the R–Rural District[.] (N.T.265)

29. To preserve farmland, in approximately 1988 the Township adopted as part of its [z]oning [o]rdinance a fixed scale subdivision program for the R–Rural District. Generally, one additional lot could be subdivided or one use added for every 10 acres of property owned in the R–Rural District. (N.T. 256; N.T. 262–265)

30. Effective on October 5, 1992, the Township amended the fixed scale zoning program to permit one lot or use for every 25 acres, rather than every 10 acres. (N.T. 265)

31. In 1993, the Township approved the rezoning of 12.499 acres of the Morgan property from R–Rural to Commercial C–2. The 12.499 acre re-zoned portion is located to the north of the [p]roperty. (N.T. 266)

32. Subsequently, the 12.499 acre re-zoned portion of the Morgan property was subdivided from the Morgan property and added to and made part of the adjacent Rockvale Center, a commercial shopping center[.] (N.T. 266)

33. At the time of the aforesaid subdivision, the remaining part of the Morgan property (consisting of 55.13 acres and located on both sides of Bowman Road) was identified on the subdivision plan as retaining the right to develop 3 additional lots in accordance with the Township's fixed scale program. (Subdivision Plan Note 31; N.T. 268)

34. *In 2003, the then owner of the Morgan property filed an additional subdivision plan, the result of which was to divide the remaining Morgan property into two lots. One of the lots is ... Applicant's [p]roperty (located on the east side of Bowman Road). The other lot is located on the west side of Bowman Road.* (N.T. 269).

35. *Plan Note No. 4 on the subdivision plan expressly stated that the lot located on the west side of Bowman Road would retain the final remaining subdivision right.* (N.T. 270)

36. *Plan Note No. 11 of the subdivision plan explicitly stated that the portion of the land located on the east side of Bowman Road (being ... Applicant's [p]roperty) was to remain as an existing agricultural use.* (N.T. 271)

37. *The then owner of the Morgan property, by preparing and recording the subdivision plan, allocated any and all remaining subdivision rights to the property on the west side of Bowman Road. The then owner of the Morgan property did not allocate any subdivision rights to the property on the east side of Bowman Road (being ... Applicant's [p]roperty).* (N.T. 271)

38. *The subdivision plan (which allocated all the remaining subdivision rights to the property on the west side of Bowman Road and none to ... Applicant's [p]roperty) is expressly referenced in the deed conveying the [p]roperty to ... Applicant.* (N.T. 272)

39. *... Applicant's land planner, Mr. Glackin, acknowledged that the current limitation on the number of lots or uses on the [p]roperty is a result of the previous subdivisions made by the prior owner of the Morgan property.* (N.T. 139)

40. Notwithstanding the fact that no further subdivision rights exist with regard to the [p]roperty, Applicant proposes to develop the [p]roperty with 54 single family detached dwellings in accordance with a Concept Plan prepared

by Van Cleef Engineering Associates. (Exhibit A–16).

\* \* \*

8. ... *Applicant ignores the history of subdivisions of the parent tract. As was documented in the chronology set forth in Township Exhibit 3 prepared by [the Township's land planner], and in the details of and plan notes in the subdivision plans reflected in township Exhibits 4 and 5, the configuration of the subject tract and the allocation to it of the right to have only one unit or use was a conscious decision by the predecessors in title of ... Applicant.* There is a suggestion by ... Applicant's witnesses that somehow, if the [p]roperty had been less than 10 acres in size, the provisions of the [z]oning [o]rdinance would then have permitted a greater number of lots or uses. The chronology of the subdivision of the parent tract demonstrates that such a conclusion isn't so. *All the development rights were effectively and consciously allocated to other portions of what had originally been the parent tract.* Consequently, it is apparent that the [z]oning [o]rdinance restrictions, as they apply to the [p]roperty, result from the conscious decisions of the predecessors in title of ... Applicant.

F.F. Nos. 27–40, Concl. of Law No. 8. As evidenced by the accompanying citations, the record clearly supports the ZHB's determinations. Based on these determinations, and our review of the 2003 subdivision plan and the 2010 deed conveying the property to Applicant, it is evident that Applicant's predecessors-in-title contemplated that the property now owned by Applicant would not be subdivided further, and Applicant's property "shall be dedicated for the express purpose of the existing agricultural use." Kime Ex. 5. Further, the deed conveying the property to Appli-

cant specifically references the 2003 subdivision plan, and it states the property is "subject to ... all notes, restrictions, burdens and obligations set forth in the [s]ubdivision [p]lan referred to above[.]" Kime Ex. 6. Thus, as the ZHB determined, Applicant's predecessor-in-title made the conscious decision to restrict development of Applicant's property, and Applicant purchased the property subject to these restrictions.

## C. Fair Hearing Before the ZHB

Applicant next maintains the trial court erred in failing to determine Applicant was denied due process. It asserts the adversarial manner in which the ZHB Chairman conducted the hearings created the appearance of bias and impropriety. Additionally, the ZHB's use of its role as factfinder to accept and omit evidence in a manner that benefitted only the Township's arguments was blatantly improper. Applicant contends these actions deprived it of a fair and impartial hearing and warrant additional judicial scrutiny of the ZHB's fact-finding function and credibility determinations.

The Township responds that the ZHB provided Applicant with due process in considering its application. It argues that isolated remarks by the ZHB's Chairman during Applicant's hearings do not indicate bias against Applicant, and even if they did, the ZHB's decision was unanimous amongst its three members. Further, the Township asserts, each argument raised by Applicant was addressed by the ZHB in its well-reasoned findings of fact and conclusions of law, and such determinations were all supported by record evidence.

▮▮▮ A fair trial before a fair tribunal is a basic and fundamental due process requirement. *Joseph v. N. Whitehall Twp. Bd. of Supervisors,* 16 A.3d 1209 (Pa. Cmwlth.2011). Thus, where a municipal

tribunal is acting in an adjudicatory role it must abide by due process standards and avoid the appearance of impropriety. *Kuszyk v. Zoning Hearing Bd. of Amity Twp.*, 834 A.2d 661 (Pa.Cmwlth.2003). A showing of actual bias is unnecessary in order to assert a cognizable due process claim; the mere potential for bias or the appearance of non-objectivity may be sufficient to constitute a violation of that right. *Id.*

In zoning cases, the ZHB is the fact-finder, with exclusive province over matters of credibility and evidentiary weight. *Manayunk Neighborhood Council v. Zoning Bd. of Adjustment of City of Phila.*, 815 A.2d 652 (Pa.Cmwlth.2002). This Court will not engage in fact-finding or disturb the ZHB's credibility determinations on appeal. *Id.*

Here, in rejecting Applicant's due process argument, the trial court explained:

[Applicant] claims that procedural defects that occurred during the hearings warrant this court reversing the decision of the [ZHB]. Specifically, [Applicant] claims the [ZHB] Chairman Dale Schmitz displayed bias against [Applicant] in calling it a 'newcomer' to Lancaster County. As further evidence of this alleged bias, [Applicant] asserts that the decision of the [ZHB] reads more like a brief advocating the Township's position.

Upon a careful review of the transcripts of the [ZHB's] meetings and subsequent decision on this matter, the statements alleged by [Applicant] to constitute bias by Chairman Schmitz, when placed in context of the hearing, are in actuality benign statements.

Mr. Schmitz: . . . Why was this site considered when it's—now it's all for farming and why did you pick that particular site to put your homes in there?

[Applicant's counsel]: Mr. Chairman, this is the site that my client owns and this is the site that they were advised [is] in the urban growth boundary and believe that they were discriminated against with the zoning of the surrounding properties in not including their tract within it. And they also feel that the zoning ordinance is exclusionary as to the regulations concerning the zoning within this district as to the one home per 25 acres.

Mr. Schmitz: There is no consideration at all for all of the rural zoning around here. It's just your plan is pick a site that has been farmed continuously as far as we know.

[Applicant's Counsel]: Mr. Chairman, I think, with all due respect, you're missing the fundamental point here, and that is this property, unlike any others in the entire rural district in this township, was earmarked from this township to be included in its rural zoning district.

So I'd submit to you the question really is not to us, as to why we picked this site for development, but rather to the township as to why they felt that this site was so special and so unique and so different from any other parcel in the rural district in this township to put it within the township's urban growth boundary and to designate it for public water and public sewer. That's what I would submit to you is the question.

Mr. Schmitz: That sounds like a wonderful answer. It didn't help very much, though, as far as my understanding is concerned.

There would be other sites, I'm sure, for your—whether he owns the site or she or whoever it is owns the site at this point. Did they own the

site for a long period of time or was it just bought for the activity you're talking about here now?

[Applicant's Counsel]: The site, Mr. Chairman, was purchased on October 12th, 2010.

Mr. Schmitz: So it's—the site is now owned by a relatively new person to Lancaster County, right?

[Applicant's Counsel]: It is owned by an entity, a limited partnership.

Mr. Schmitz: Say that again.

[Applicant's Counsel]: It's owned by a limited partnership that's been formed in the State of Pennsylvania.

Mr. Schmitz: That's interesting.

That's all the questions I have now for you.

[Applicant's Counsel]: Mr. Chairman, if I can just follow up on that comment, that's interesting. What part of it did you mean was interesting?

Mr. Schmitz: I suggest that you decide what I mean. Okay?

(N.T. Hearing 4/26/12, 237:10—239:14.)

Even if these statements were considered as evidencing bias by Chairman Schmitz, they were harmless in that they had no bearing on the application of the law to the facts as presented in this case. Furthermore, the decision was unanimous amongst the [ZHB], and as such, Chairman Schmitz's vote was not the deciding factor in the decision of the [ZHB].

Applicant also claims that the decision is written like a brief advocating the Township's position. [Applicant] points to paragraphs 64, 65, 93, 101, and 107 of the [ZHB's] findings of fact and paragraphs 13 and 16 of the [ZHB's] conclusions of law as evidence of the [ZHB's] bias. On review of these paragraphs,

the court concludes that these paragraphs relate to the [ZHB's] findings of credibility, which is not the proper subject of review by this court. These findings also relate to specific pieces of testimony of witnesses which the [ZHB] found relevant to the resolution of the instant appeal. The conclusions reached in paragraphs 13 and 16 have [a] factual basis in the record, and as such, this court will not disturb those findings. As such, this court is unable to discern any bias by the [ZHB] that affected its decision on the instant [a]pplication. Thus, [Applicant's] final claim of error of the [ZHB] also fails.

Tr. Ct., Slip Op., 4/9/13, at 8–10.

■ Based on our review of the above-quoted excerpt of the hearing cited by Applicant, no error is apparent in the trial court's determination that these isolated statements do not clearly evidence bias on the part of the ZHB's Chairman. *Cf. Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings ... do not constitute a basis for a bias or partiality motion *unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.* Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.") (Underlined emphasis added.) [9]

9. The Pennsylvania Supreme Court cited *Liteky v. United States*, 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) with approval

Further, based on our review of the ZHB's decision, we disagree with Applicant's assertion that the decision exhibits bias and an adversarial spirit and reads more like a brief than a decision. Moreover, from our review of the record (and as evidenced by the record citations accompanying the ZHB's findings), the ZHB's decision is adequately supported. Also, the ZHB's decision to credit the testimony of the Township's witnesses over that presented by Applicant's witnesses is not reviewable on appeal, *Manayunk Neighborhood Council.* In any event, the ZHB explained the reasons for its credibility determinations. Because the record supports the ZHB's findings, we cannot disturb those findings, which are based on the ZHB's resolution of conflicting evidence. *Id.* For these reasons, we reject Applicant's due process claim.

Nevertheless, Applicant points out that in *Realen,* the Supreme Court signaled, without deciding, that additional scrutiny may be warranted in cases where a ZHB's performance of its fact-finding function deprived an applicant of a fair and impartial hearing. Here, however, the ZHB's performance of its fact-finding function did not deprive Applicant of its right to a fair and impartial hearing. To that end, this is not a situation such as that referenced in *Realen,* where "the fact-finder's necessary findings, although minimally supported by record evidence, capriciously and without reasonable explanation disregard over-

whelming evidence having a contrary import." *Id.* at 138, 838 A.2d at 732. Rather, the ZHB's findings here, nearly all of which contain accompanying record citations, are amply supported by the record. *See Atherton* (distinguishing *Realen*).

Furthermore, the ZHB's decision was subject to review by the trial court, and there is no indication that Applicant sought to present additional evidence before the trial court regarding its claim that the ZHB deprived Applicant of its right to a fair proceeding. *Cf. Knipple v. Geistown Borough Zoning Hearing Bd.,* 155 Pa. Cmwlth. 120, 624 A.2d 766 (1993) (concluding zoning board consciously discriminated against a landowner when it denied his variance request based on findings made by common pleas court after receipt of additional evidence).

Based on the foregoing, we affirm.[10]

### ORDER

**AND NOW,** this 29th day of January, 2014, the order of the Court of Common Pleas of Lancaster County is **AFFIRMED.**

---

in *Commonwealth v. Druce,* 577 Pa. 581, 848 A.2d 104 (2004).

**10.** As a final point, Applicant argues that, if this Court finds the zoning ordinance and zoning map unlawfully prevent or restrict development as set forth in Applicant's validity challenge, it should afford Applicant definitive

relief in accordance with Section 1006–A of the MPC by ordering the approval of Applicant's "Concept Plan."

As set forth above, the ZHB properly rejected Applicant's validity challenges. Thus, we need not reach this issue.