IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Catherine and Kevin Keller, : 
          Petitioners : 
      : No.  1120 C.D. 2018
     v. : 
      : Argued:  September 10, 2019
Department of Human Services, : 
          Respondent : 


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge


***OPINION NOT REPORTED***

MEMORANDUM OPINION
BY JUDGE McCULLOUGH             FILED:  October 10, 2019


       Catherine and Kevin Keller (the Kellers) petition for review of the July 11, 2018 final order of the Department of Human Services (Department), Bureau of Hearings and Appeals (BHA) denying the Kellers' appeal of a decision by Berks County Children and Youth Services (CYS) denying the Kellers' application as a foster family resource home.


## Background

       On May 3, 2017, the Kellers applied with CYS to be a kinship care foster resource[1] for their granddaughters.  (Administrative Law Judge (ALJ) Adjudication, Findings of Fact (F.F.) No. 1.)  CYS informed the Kellers that they

---

[1] "'[K]inship care' is a subset of foster care where the care provider already has a close relationship to the child." *In re J.P.*, 988 A.2d 984, 987 n.3 (Pa. Super. 2010).

needed to complete a mental health evaluation in order to be considered as a foster resource for CYS. (F.F. No. 2.) A kinship resource mental health evaluation of the Kellers was completed on August 17, 2017. (F.F. No. 3.)

On October 11, 2017, CYS notified the Kellers that it would not approve their application to be a foster care resource. (F.F. No. 7.) The notice provided by CYS stated that its decision to deny the application was based on the following factors: (1) the Kellers' inability to demonstrate stable mental and emotional adjustment, which could negatively affect a child placed in their care; (2) the Kellers' existing family relationships, attitudes, and expectations regarding their own children could negatively affect a child placed in their care; (3) the Kellers' inability to accept the relationship that a child placed in their care has with his own parents; (4) the Kellers' inability to care for a child with special needs, i.e., a physical handicap or emotional disturbance; (5) the Kellers were unsuited to the characteristics of a foster child; (6) the Kellers' inability to work in partnership with CYS; and (7) the Kellers failed to provide CYS with evidence of their financial stability. (Certified Record (C.R.) at 15.)

The Kellers appealed CYS's decision and a BHA ALJ conducted a hearing on April 12, 2018, at which Mr. and Mrs. Keller; Dr. Richard Small, a licensed psychologist; and CYS representative Amanda Wargo testified. Following the hearing, the ALJ issued an adjudication and made the following, pertinent, findings:

> 4. Dr. Small opined that he had significant concerns about the [Kellers'] personal history with their own children.
> 5. Mrs. Keller reported being molested through much of her childhood by a variety of people. Dr. Small stated that it was difficult to ascertain whether Mrs. Keller had 'worked through' those issues, and he

2

opined that the problems of her own childhood suggest that Mrs. Keller's problems may have been a contributing factor to the family dysfunction.

6. Dr. Small opined that the Kellers' negative attitudes toward Mrs. Keller's daughter (the mother of their granddaughters) could create negative attitudes towards her children were they to be placed in the [Kellers'] care.

. . .

10. The [Kellers'] monthly expenses exceed their monthly income by approximately $220.

11. The police have been called to the [Kellers'] residence on numerous occasions.

12. Mr. Keller is not on speaking terms with one of his children and called the police after being threatened by another.

13. Mrs. Keller had three adult children. Of those three, two were placed in a group home. One was involved in juvenile probation and eventually into placement. Another child had a [protection from abuse] PFA placed against him by Mrs. Keller. All three children have a history of drug use.

14. On the application, in response to the question 'Are you comfortable with a birth parent knowing the physical location of your home or having your telephone number?' the [Kellers] responded 'no.' The [Kellers] added in the margin 'My daughter has destroyed items in my home and I do not want her on the property.'

(F.F. Nos. 4-6, 10-14) (citations omitted).

The ALJ noted that under the foster care regulations, when assessing whether an applicant should be approved as a foster parent, the foster care agency must consider the ability of an applicant to work in partnership with the agency. The ALJ also explained that one of the goals of the foster care system is to reunify birth parents with their children. The ALJ concluded that the Kellers had not

demonstrated that they were willing to work with CYS. The ALJ observed that Mrs. Keller has a difficult relationship with her daughter, the mother of the children in question, and had specifically advised on her application that she was not comfortable with a birth parent knowing her telephone number or address and that her daughter had destroyed items in her home. Therefore, the ALJ determined that "any reunification efforts would be stalled by the [Kellers] due to the nature of their relationship with Mrs. Keller's daughter. As such, it [was] safe to assume that the [Kellers] do not have the ability to work in partnership with CYS as required by the" regulations. (ALJ Adjudication at 10.)

The ALJ also determined that under the regulations the agency must consider whether the applicant is able to care, nurture, and supervise children. The ALJ found that Mr. Keller was not on speaking terms with one of his children and had called the police after being threatened by another. The ALJ further noted that Mrs. Keller had three adult children, of whom two had been placed in a group home as children, one was involved with juvenile probation and put into a placement program, one had a PFA placed against him by Mrs. Keller, and all three had a history of drug use. The ALJ concluded that "[i]f we allow the [Kellers] to raise additional children, there is a good chance that the pattern will continue. The hearing record is clear." *Id.* Accordingly, based on the hearing record the ALJ determined that the Kellers "lacked the ability to provide care, nurturing and supervision to their own children, much less children who are wards of the county." *Id.*

Next, the ALJ explained that the regulations require the agency to consider the applicant's ability to demonstrate stable mental and emotional adjustment and that, if mental stability is in question, the agency may request a psychological evaluation. The ALJ noted that CYS had requested a mental health evaluation of the Kellers and that Mrs. Keller had reported "a life filled with drama, including being molested through much of her childhood by a variety of people."

4

*Id.* The ALJ observed Dr. Small's conclusion that it was difficult to ascertain whether Mrs. Keller worked through these issues and that Mrs. Keller's own children's problems "suggest that Mrs. Keller's problems may have been a contributing factor to the family dysfunction." *Id.*

Additionally, the ALJ explained that under the regulations, when deciding whether a foster parent applicant should be approved, the agency must assess the applicant's existing family relationships, attitudes, and expectations regarding the applicant's own children and parent/child relationships and, especially, as they might affect a foster child. The ALJ noted that there clearly was "an issue between the [Kellers] and Mrs. Keller's daughter" and that the "problems involving the other children of the [Kellers] [was another] cause for concern." (ALJ Adjudication at 11.) The ALJ was also concerned that the police had been summoned to the Kellers' home numerous times as many of those incidents involved domestic disputes. Thus, the ALJ concluded that "[a]s a whole, the hearing record demonstrate[d] a fractured family dynamic." *Id.*

The ALJ also observed that the regulations require a foster home to have financial stability. Based on the information provided by the Kellers in their application, the ALJ determined that the Kellers' monthly expenses exceeded their monthly income by approximately $220. *Id.*

The ALJ made the following conclusion:

> Looking at the totality of the circumstances, the [Kellers] presented, both to Dr. Small and at [the] hearing, as a pleasant and friendly couple. However, when you delve into the information provided both by the [Kellers] and by CYS, it is clear that the [Kellers] should not be approved as a foster resource home. The [Kellers], especially Mrs. Keller, have a long history of family dysfunction. The [Kellers] are quick to downplay, deny, or disregard the issues that they have had within both their separate homes when not a couple, and the familial home and the

numerous calls to the police. Mrs. Keller's mental stability is in question, as are the family finances. The children the [Kellers] raised have a history of placement, substance abuse, juvenile detention, PFAs, DUIs, and threats of violence. Any one of these issues would have been good cause for denial of their application. Taken as a whole, there is no doubt.

. . .

The burden of proof was on [CYS] to demonstrate, by substantial evidence, that the [Kellers] failed to meet the statutory guidelines necessary to be considered as a foster home. As per the analysis above, CYS has done so. As such, [CYS] met their burden of proof that their decision to deny the [Kellers'] application as a kinship foster resource was correct. For all the foregoing reasons, it is my Recommendation that the [Kellers'] appeal be denied.

*Id.* BHA adopted the ALJ's recommendation in its entirety.

## Discussion

The Kellers now petition for review of BHA's order,[2] arguing (1) the ALJ did not render an unbiased and impartial decision, which necessitates remanding the matter for another hearing before a neutral ALJ and (2) there is not substantial evidence in the record to demonstrate that the Kellers are unable to care for foster children.

---

[2] "This Court's review in an appeal from an order of [BHA] is limited to determining whether constitutional rights were violated, whether any errors of law were committed and whether any necessary factual findings are supported by substantial evidence." *Burns v. Department of Human Services*, 190 A.3d 758, 761 n.1 (Pa. Cmwlth. 2018).

## A. Judicial Bias

We first address the Kellers' bias argument. The Kellers argue that throughout the hearing the ALJ exhibited antagonism toward them. The Kellers argue that at the beginning of the hearing, the ALJ stated "if you prevail in this hearing, you are not getting your grandchildren" and "[w]in lose or draw here, you are not getting your grandchildren because [CYS] is not placing them with you. . . . I don't like wasting people's time." (Kellers' Br. at 8.)

The Kellers also argue the ALJ made antagonistic remarks in response to an objection lodged by the Department. The Department objected to a line of questioning about the Kellers' foster care application on the grounds that they verified the document and were at risk of perjuring themselves. The ALJ stated that if Mr. Keller answered questions differently than what was written in the application "he's cutting his own throat," and that "if he says it's incorrect, then clearly that signature is worthless on the back. . . . So if you're willing to do that, be my guest cause it's only going—it's only going to do damage." (Kellers' Br. at 12.) The Kellers maintain it was inappropriate for the ALJ to make such comments because due process demands impartiality and fairness and that the ALJ's hostile remarks evidenced judicial bias.

In contrast, the Department argues that the ALJ's comments did not exhibit bias. Regarding the comments about the Kellers not getting their grandchildren, the Department maintains that the ALJ was merely advising the parties of the scope of his authority, because he lacked authority to order a child placed in a specific foster care household, and that he was in no way announcing that he had already decided the outcome of the hearing. With regard to the perjury comments, the Department alleges that the ALJ simply advised the Kellers that verified signatures were not to be taken lightly and that admitting to signing a document with false statements might be detrimental to their case. In any event, the

7

Department notes that the ALJ overruled the objection, permitted Mr. Keller to answer the question, and Mr. Keller verified that the statements in the application were correct.

"[A] fair trial in a fair tribunal is a basic requirement of due process." *Withrow v. Larkin*, 421 U.S. 35, 46 (1975); *see also Johnson v. Mississippi*, 403 U.S. 212, 216 (1971) ("Trial before an 'unbiased judge' is essential to due process."); *Penn Street, L.P. v. East Lampeter Township Zoning Hearing Board*, 84 A.3d 1114, 1145 (Pa. Cmwlth. 2014) ("A fair trial before a fair tribunal is a basic and fundamental due process requirement."). This basic precept "applies to administrative agencies which adjudicate as well as to courts." *Withrow*, 421 U.S. at 46. "A showing of actual bias is unnecessary in order to assert a cognizable due process claim; the mere potential for bias or the appearance of non-objectivity may be sufficient to constitute a violation of that right." *Penn Street*, 84 A.3d at 1146.

Yet, opinions that are formed by a "judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Cellucci v. Laurel Homeowners Association*, 142 A.3d 1032, 1045 (Pa. Cmwlth. 2016) (same); *Penn Street*, 84 A.3d at 1147 (same). Accordingly, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555; *see also*, *Celluci*, 142 A.3d at 1045 (same); *Penn Street*, 84 A.3d at 1147 (same). Such judicial remarks *may* support a bias or partiality opinion "if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555. "*Not* establishing bias or partiality,

8

however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id.* (emphasis in original).

Here, the Kellers point to two instances that demonstrate the ALJ's alleged bias. The Kellers argue that in the first instance the ALJ stated that they would not get their grandchildren under any circumstances. At the hearing, the following exchange occurred:

> JUDGE: Okay. And just as an aside because of the nature of these types of hearings, did—at the pre-hearing conference, did the Judge go over the issue between the application and any placement that the County may or may not place the child, whether your client's [sic] win or lose this hearing? Did they go over anything of that nature?
>
> ATTORNEY GRIMES: They—Judge McMahon did just for—at the—very beginning at the call explain that it's just with regard to licensing, that they can't order the child being placed there. I'm not sure if Ms. Gray was on that call.
>
> ATTORNEY GRAY: I don't recall, honestly.
>
> . . .
>
> JUDGE: All. Right. Well, I'll just—I'll just go over it briefly again just to make sure. The issue that [BHA] has **regarding jurisdiction is simply with the application process**. [BHA] **does not have jurisdiction regarding placement of any children**. It looks, in, in the hearing record—again, we haven't had the hearing yet, but it looks as if Mr. and Mrs. Keller, you are only looking for specific, your grandchildren, as a foster resource and no other children. Is that correct?

9

ATTORNEY GRAY: That's correct.

JUDGE: Okay. Then let me ask [CYS] this question. That if the Kellers would prevail, what is [CYS's] position on placement of those children with the Kellers?

ATTORNEY GRIMES: We are not in agreement. And the GuardIa. [sic] Ad Litem for the child is not in agreement as well, as well as the biological parents.

JUDGE: Okay. So I just want everyone understanding this, going forward, that if you prevail in this hearing, you are not getting your grandchildren. Okay? Just so you're—everyone is on the same page. **I don't have jurisdiction over this. I cannot make them do that**. And, in fact, if that [CYS] is not going to do that, you're not going to get them. So if you would prevail in this hearing, then you would be deemed a foster resource for [CYS], if they wish to place any other random foster children in your care, other than your grandchildren. But I want to make this clear, I'm always an individual that lays my cards out on my sleeve. Win, lose or draw here, you are not getting your grandchildren because [CYS] is not placing them with you. Are we all on the same page? I just, I don't want to—I don't like wasting people's time. I don't like, you know, giving anyone a false sense of hope or security or anything along those lines. I'm not saying regardless of how this comes out, I just want everyone to know, be aware, that your grandchildren are not being placed no matter what happens here today. Are we understanding that and we're okay with that?

ATTORNEY GRIMES: Yes.

ATTORNEY GRAY: Yes.

(C.R. at 101-104; Notes of Testimony (N.T.), 4/12/18, at 7-10) (emphasis added).

10

Based on our review of the record, the ALJ did not express such "deep-seated favoritism or antagonism" toward the Kellers that a fair judgment was impossible. *Liteky*, 510 U.S. at 555. Instead, the ALJ merely explained the scope of his jurisdiction and his lack of authority to order that the Kellers' granddaughters be placed with them.

This Court has previously held that under the Juvenile Act,[3] "jurisdiction over disputes regarding adoption, custody and **placement** of dependent children is vested in the court of common pleas." *Luzerne County Children and Youth Services v. Department of Public Welfare*, 826 A.2d 84, 86 (Pa. Cmwlth. 2003) (emphasis added); *see also Burns v. Department of Human Services*, 190 A.3d 758, 763 (Pa. Cmwlth. 2018); *Ramer v. Department of Human Services* (Pa. Cmwlth., No. 1066 C.D. 2015, filed December 10, 2015), slip op. at 6.[4] Thus, the Department lacks the authority to order a particular child be placed in a foster care household. *Luzerne County*, 826 A.2d at 86. Further, section 6351(a) of the Juvenile Act states that if a child is found dependent "the **court** may make any of the following orders of disposition best suited to the safety, protection and physical, mental, and moral welfare of the child" including, transferring temporary legal custody to "any relative." 42 Pa.C.S. §6351(a) (emphasis added); *see also Conklin v. Department of Public Welfare*, 522 A.2d 1207, 1210 (Pa. Cmwlth. 1987) (noting that although a children and youth services caseworker "may make an initial recommendation regarding the ultimate disposition of a foster child, that recommendation is clearly not a final order or adjudication and is always subject to the approval of the court" since section 6351 of the Juvenile Act "empowers . . . the

---

[3] 42 Pa.C.S. §§6301-6365.

[4] Pursuant to this Court's Internal Operating Procedures, an unreported opinion of the Court filed after January 15, 2008, may be cited for its persuasive value. 210 Pa. Code §69.414(a).

court to order the transfer of legal custody of a dependent child to a foster home or public welfare facility").

Here, the ALJ accurately explained to the parties that he could only make recommendations and findings of fact regarding CYS's decision to deny the Kellers' application to be a foster family resource and that he did not have jurisdiction to order the placement of the Kellers' granddaughters. This was not evidence of bias, but instead, reflects that the ALJ was merely attempting to manage the parties' expectations with respect to the purpose of the hearing.

The Kellers also argue that a second exchange involving the ALJ's response to the Department's objection to a line of questioning on perjury grounds is indicative of bias. After the Kellers' attorney showed Mr. Keller his foster care application, which he had submitted to CYS, the following exchange occurred:

> ATTORNEY GRAY:
> Q: Mr. Keller, could you look at page 11? Can you look at the amounts on page 11 for net income?
> A: Uh-huh (yes).
> Q: Is that in your handwriting or someone else's?
> A: Actually, that is in M[r]s. Keller's handwriting.
> Q: Is that correct?
>
> ATTORNEY GRIMES: Your Honor, I'm going to object if she's going to—this, this document is verified. So if she's now going to perjure—tell—basically have her client admit to perjury, I'm going to be very concerned about because both Mr. and Mrs. Keller signed this document verifying it's [sic] accuracy under penalty of perjury on page 29.
>
> JUDGE: I mean, if you want him to answer that, and if he says that it's incorrect, then you're—he's cutting his own throat, have at it. I mean, I'll allow you to ask the question because that's what's happening.

ATTORNEY GRAY: Well, if someone has made a mistake, it's not perjury.

JUDGE: Well, I know. But it's a—it's a blatant error that they signed off that everything in that document is true and correct. So you don't just make mistakes on documents like that. So if you wish to do that, have it. Ask the question.

ATTORNEY GRAY: I will.

JUDGE: Okay. Because, if he says it's incorrect, then clearly that signature is worthless on the back. So just so we're all on the same page, because you don't—when you sign a document and it's on—signed multiple times on here, on page five and on page 29, it says, not only under penalty of perjury, but you are swearing that everything on here is accurate. You don't just willie nillie fill it in and say, later on, yeah I screwed up. So if you're willing to do that, be my guest cause it's only going—it's only going to do damage. That's all I'm telling you. Go ahead. Ask the question.

ATTORNEY GRAY:
    Q: Is the amount correct?
    A: At the time I signed this, to the best of my knowledge that was correct.

(N.T., 4/12/18, at 74-76.)

Based on the preceding exchange, this Court can appreciate why the Kellers might express concern to the ALJ's comments. Comments such as "cutting his own throat" and suggestions that a signature will be rendered "worthless" could have the potential to set hearing participants on edge; especially in cases such as these where the participants have limited to no experience appearing in a tribunal or before an adjudicator. While the particular phraseology could have been better chosen, taken in the context in which the ALJ expressed his thoughts in this matter,

13

we cannot find that the ALJ rendered an impartial adjudication. However, in another context, the use of these words might have had another unintended result.

Nevertheless, the foregoing exchange did not display "deep-seated favoritism or antagonism" amounting to judicial bias. *Liteky*, 510 U.S. at 555. While the ALJ's comments regarding counsel for the Kellers' line of questioning were somewhat disapproving, judicial remarks that "are critical or disapproving of . . . counsel [or] the parties . . . ordinarily do not support a bias or partiality challenge." *Id*. As the arbiter of credibility, *see S.T. v. Department of Public Welfare*, 681 A.2d 853, 856 (Pa. Cmwlth. 1996), the ALJ appears to have been advising Mr. Keller and his attorney that if Mr. Keller answered questions concerning his income differently than what was written on the application, it would damage the Kellers' credibility because the application was signed under penalty of perjury. Such an opinion formed on the "basis of facts introduced or events occurring in the course of the current proceedings" does not constitute bias. *Liteky*, 510 U.S. at 555. Moreover, the ALJ overruled the objection, permitted Mr. Keller to answer the question, who verified what was written on the application, and there is no evidence that the ALJ considered the exchange in his decision. Accordingly, we conclude that the Kellers have not demonstrated that the ALJ exhibited such a high degree of favoritism or antagonism to make a fair judgment impossible.

### B. Substantial Evidence

We next turn to the Kellers' argument that there is not substantial evidence in the record to demonstrate that they are unable to care for foster children. The Kellers note that in making his decision, the ALJ placed weight on the fact that the Kellers had difficult relationships with their children and that Mrs. Keller's children had been placed in group homes as children and had struggled with drug abuse. The Kellers argue that it was unfair for the ALJ to blame them for the actions

14

of their adult children whom they do not control. The Kellers also contend that the ALJ should not have relied on Dr. Small's opinion that it was difficult to ascertain whether Mrs. Keller had worked through the issue of being abused as a child. The Kellers maintain that CYS "turn[ed] the victim Mrs. Keller into a victim again by blaming her stating her problems may have been a contributing factor to the family dysfunction." (Kellers' Br. at 16) (internal quotation marks omitted).

Conversely, the Department argues there is substantial evidence in the record to support the decision to deny the Kellers' home as a foster family resource. The Department argues that the foster care regulations list a number of factors to be considered by an agency when approving a home as a foster family resource. The Department asserts that CYS presented substantial evidence demonstrating the Kellers' inability to meet many of these factors. The Department notes that the Kellers were unable to demonstrate that they were emotionally and mentally stable. The Department maintains that the ALJ did not focus on the behavior of the Kellers' children, but rather, the actions of the Kellers toward their children and how their relationships with their children reflect on how they may act toward their granddaughters. Viewing the totality of the evidence, the Department argues there is more than substantial evidence that the Kellers failed to qualify as a foster family resource.

Initially, we note that when determining whether factual findings are supported by substantial evidence, this Court is required to "give the party in whose favor the decision was rendered the benefit of all reasonable and logical inferences that may be drawn from the evidence of record; the weight and credibility to be accorded this evidence is solely within the province of the . . . fact finder." *S.T.*, 681 A.2d at 856. Substantial evidence is defined as "evidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to

15

support a conclusion." *F.R. v. Department of Public Welfare*, 4 A.3d 779, 783 (Pa. Cmwlth. 2010).

> The foster care regulations at issue provide as follows:
>
> (a) The [Foster Family Care Agency (FFCA)] shall consider the following when assessing the ability of applicants for approval as foster parents:
>> (1) The ability to provide care, nurturing and supervision to children.
>> (2) A demonstrated stable mental and emotional adjustment. If there is a question regarding the mental or emotional stability of a family member which might have a negative effect on a foster child, the FFCA shall require a psychological evaluation of that person before approving the foster family home.
>> (3) Supportive community ties with family, friends and neighbors.
>
> (b) In making a determination in relation to subsection (a) the FFCA shall consider:
>> (1) Existing family relationships, attitudes and expectations regarding the applicant's own children and parent/child relationships, especially as they might affect a foster child.
>> (2) Ability of the applicant to accept a foster child's relationship with his own parents.
>> (3) The applicant's ability to care for children with special needs, such as physical handicaps and emotional disturbances.
>> (4) Number and characteristics of foster children best suited to the foster family.
>> (5) Ability of the applicant to work in partnership with an FFCA.

55 Pa. Code §3700.64. Further, section 6344(d)(8)(viii) of the Child Protective Services Law mandates that a prospective foster parent provide evidence of financial stability. 23 Pa.C.S. §6344(d)(8)(viii).

In arguing that the ALJ's decision was not supported by substantial evidence, the Kellers do not challenge any of the specific factual findings made by the ALJ, but instead, appear to object to the weight given certain evidence, which resulted in the ALJ's conclusion that the Kellers were unable to care for foster children. We conclude that the ALJ carefully weighed the evidence presented in relation to the factors outlined in 55 Pa. Code §3700.64 and section 6344(d)(8)(viii) of the Child Protective Services Law to reach his decision.

First, in evaluating whether the Kellers were able to work in partnership with CYS as required by 55 Pa. Code §3700.64(b)(5), the ALJ noted that on the foster care application, Mrs. Keller stated that she was not comfortable with her daughter, the mother of the children in question, knowing her home and telephone number, that her daughter had destroyed items in her home, and that she did not want her daughter on her property. (ALJ Adjudication at 10) (citing C.R. at 31). Although not always possible, one of the goals of the foster care system is the reunification of foster children with their birth parents, *see, e.g.*, *In re Adoption of S.E.G.*, 901 A.2d 1017, 1019 (Pa. 2006); the ALJ concluded that any reunification efforts would be stalled by Mrs. Keller's relationship with her daughter and, therefore, that the Kellers lacked the ability to work in partnership with CYS.

The ALJ also assessed whether the Kellers were able to provide care, nurturing and supervision for foster children as required under 55 Pa. Code §3700.64 (a)(1) of the foster care regulations. When making the assessment under this section, the regulations further provide, under 55 Pa. Code §3700.64(b)(1)(2), that the ALJ should look at existing family relationships and the ability of the applicant to foster a relationship with the child's parents. In this regard, here, the ALJ noted that Mr. Keller was not on speaking terms with one of his children, had called the police after being threatened by another, and that Mrs. Keller's children had encountered significant problems during their lives, including all three being placed in group

17

homes as children, one being subject to juvenile probation, one having had a PFA placed against him by Mrs. Keller, and all three suffering from drug abuse. (ALJ Adjudication at 10) (citing CYS Kinship Resource Evaluation, C.R. at 61-65; N.T., 4/12/18, at 82-84, 107-18).

The ALJ also, pursuant to 55 Pa. Code §3700.64(b)(1), evaluated the Kellers' existing family relationships, attitudes, and expectations regarding their own children and parent/child relationships, especially as they might affect a foster child. The ALJ found that Mrs. Keller's relationship with her daughter, problems involving the Kellers' other children, and the numerous times that police had been summoned to the Kellers' home for domestic disputes were all causes for concern and might impact foster children placed in their care. (ALJ Adjudication at 11.) Further, based on the Kellers' foster home application, in which the Kellers reported that their monthly expenses exceed their monthly income by approximately $220, the ALJ concluded that the Kellers had not demonstrated financial stability pursuant to section 6344(d)(8)(viii) of the Child Protective Services Law. (ALJ Adjudication at 11) (citing C.R. 36-37).

Additionally, the ALJ examined whether the Kellers had "demonstrated stable mental and emotional adjustment" as required under 55 Pa. Code §3700.64(a)(2). The ALJ noted that Mrs. Keller reported being molested by a variety of people throughout her childhood and that Dr. Small opined that it was difficult to ascertain whether Mrs. Keller had resolved these issues and that Mrs. Keller's problems may have been a contributing factor to her family's dysfunction. (ALJ Adjudication at 10) (citing C.R. at 61-65; N.T., 4/12/18, at 17-18). Although the Kellers contend that the ALJ engaged in victim blaming, the ALJ did not blame Mrs. Keller for what happened to her but appears to have concluded that, based on Dr. Small's opinion, Mrs. Keller had not demonstrated stable mental and emotional adjustment.

18

In light of the above, the ALJ concluded that the Kellers and, "especially, Mrs. Keller, have a long history of family dysfunction" and "[i]f we allow the [Kellers] to raise additional children, **there is a good chance that the pattern will continue**." (ALJ Adjudication at 10-11) (emphasis added). Contrary to the Kellers' assertion, the BHA did not blame them for the actions of their children, but instead, concluded that due to the difficulties they faced in raising their own children and the lack of financial stability, it seemed probable this would impact their ability to provide care, nurturing and supervision to foster children, as required under the regulations. This process of assessment, as uncomfortable as it might be, is required to be undertaken by the ALJ under the regulations. If the findings therefrom dictate a certain result, the ALJ does not have widespread discretion to alter that result, even though the result might be deeply disappointing to any well-intended applicants. The Court views these findings only as part of the assessment process, and not as a negative reflection on the applicants personally.

On the other hand, we conclude the ALJ's finding that Mrs. Keller had not demonstrated stable mental and emotional adjustment was not supported by substantial evidence in the record. Dr. Small merely concluded in his psychological report that "it was **difficult to ascertain** whether M[r]s. [Keller] [had] worked through the issues of her trauma or predict whether her abuse and neglect would re-traumatize her." (C.R. at 64) (emphasis added). Dr. Small did not actually conclude that Mrs. Keller had not worked through the issues of her traumatic childhood; thus, any finding to the contrary is speculative and is not a "reasonable and logical inference" that can be drawn from Dr. Small's psychological report. *S.T.*, 681 A.2d at 856. Thus, the psychological report does not support the finding that Mrs. Keller had not demonstrated stable mental and emotional adjustment because of her traumatic upbringing.

19

Nonetheless, other evidence of record, heretofore discussed, supports the ALJ's determination that CYS met its burden of demonstrating that the Kellers failed to meet the statutory guidelines necessary to be considered as a foster resource home. In particular, the evidence of the Kellers' financial instability, as well as Mrs. Keller's complicated relationship with her daughter, the mother of the foster children in question, which had the potential to negatively impact the children and make reunification with their mother more difficult, provides strong support for the ALJ's determination. Thus, we must conclude there is substantial evidence in the record to support the ALJ's decision denying the Kellers' application to be considered a foster family resource due to their inability to meet several of the factors listed in 55 Pa. Code §3700.64.

## Conclusion

Accordingly, we are constrained to affirm the BHA's order.

_____

PATRICIA A. McCULLOUGH, Judge

20

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Catherine and Kevin Keller,      :
         Petitioners      :
                      :    No.  1120 C.D. 2018
         v.             :
                      :
Department of Human Services,      :
         Respondent      :

## ***ORDER***

AND NOW, this 10th day of October, 2019, the July 11, 2018 order of the Department of Human Services, Bureau of Hearings and Appeals, is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge